**Miriam L. VICKERS, Plaintiff–Appellant,**

v.

**UNITED STATES of America; United States Department of Justice; Immigration and Naturalization Service, Defendants–Appellees.**

No. 99–55976.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 7, 2000

Filed Oct. 3, 2000

Connie Guerry, Pasadena, California, for the plaintiff-appellant.

Alejandro N. Mayorkas, United States Attorney, Leon W. Weidman, Assistant United States Attorney, Alarice M. Medrano, Assistant United States Attorney, and Julie Zatz, Assistant United States Attorney, Los Angeles, California, for the defendants-appellees.

Before: REINHARDT and BERZON, Circuit Judges, and BREYER,[1] District Judge.

BERZON, Circuit Judge:

After a domestic argument, Akanni Kendalla, a detention enforcement officer with

---

1. The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, sitting by designation.

the Immigration and Naturalization Service (INS), shot and seriously injured Miriam Vickers, another INS employee and his former wife, with his Service-issued revolver. Ms. Vickers filed this action under the Federal Tort Claims Act, (FTCA), 28 U.S.C. § 2671 et seq., claiming that the United States should be held liable for her injuries. She contends that the INS was negligent in supervising and retaining Mr. Kendalla as a detention officer entitled to carry a Service-issued firearm, and in failing to investigate an alleged shooting incident involving Mr. Kendalla and a former girlfriend. As a result of these negligent actions by INS employees acting within the scope of their employment, Ms. Vickers maintains, Mr. Kendalla was in possession of the gun he used to shoot her, a gun he otherwise would not, and should not, have had.

The INS moved for summary judgment on the ground that its challenged conduct was a matter of choice or judgment and therefore within the FTCA discretionary function exception to government liability for torts, 28 U.S.C. § 2680(a), and also on the ground that its negligence, if any, was not a legal cause of Ms. Vickers' injuries. Ms. Vickers countered that the discretionary function exception shields none of the challenged conduct and that under California law she is entitled to a trial on the causation question. The district court granted the INS's motion on both grounds, and Ms. Vickers appealed.

## I.

Mr. Kendalla and Ms. Vickers both began working for the INS in 1991, at the Terminal Island Detention Center in San Pedro, California. They soon met and began a personal relationship, and, in December 1992, they married. The marriage ended in divorce after ten months.

Thereafter, the INS found after an investigation, Mr. Kendalla began a relationship with Mercedes Callada–Ramirez, an inmate under Mr. Kendalla's guard at Terminal Island. The investigation, triggered by a complaint Ms. Callada–Ramirez filed in December 1994, further revealed the following facts, not here contested:

On at least two occasions during her detention, Mr. Kendalla released Ms. Callada–Ramirez from her cell while he was working the night shift. They then stole away to the detention center's processing and segregation area where they engaged in sexual relations. When the INS released Ms. Callada–Ramirez from detention to her father in New York, Mr. Kendalla encouraged her to come live with him and provided her with a ticket so that she could return to California. She accepted his offer and the two lived together in Long Beach until Mr. Kendalla left Ms. Callada–Ramirez in November 1994.

During the investigation of her complaint, Ms. Callada–Ramirez also related to INS investigators a physical altercation that occurred while she was living with Mr. Kendalla after her release:

Q: O.K., beginning of November 1994, what happen [sic] then?

A [Ms. Callada–Ramirez]: He was being unfaithful. We had several fights. I shot at him with his revolver.

Q: You shot at him?

A: Yes, and he shot at me, we hit each other . . . .

Q: When you shot at him, was it with his own revolver?

A: Yes . . . .

Q: Did he shoot at you? Did he hit you or something?

A: No, he hit me.

When they later interviewed Mr. Kendalla, the investigators asked him whether he ever struck Ms. Callada–Ramirez; in reply, Mr. Kendalla insisted that "I never hit that wom[a]n." [2] There were no ques-

---

**2.** The INS investigators concluded that Mr. Kendalla lied during his interview, and Ms. Callada–Ramirez told the truth in hers, about almost every detail of the relationship between the two. There was no specific finding about the truth of Mr. Kendalla's statement that he had not hit Ms. Callada–Ramirez because that allegation was not investigated fur-

tions to Mr. Kendalla, however, about the shooting allegations, nor, as far as the record shows, was there any other attempt to investigate Ms. Callada–Ramirez's story regarding the off-duty firing of Mr. Kendalla's gun.[3]

The INS investigators deposed in this case offered no explanation of why they did not investigate the shooting incident, while INS managers testified that they would have considered the allegations, if reported to them, violations of Department of Justice policy governing the conduct of detention officers.

During its inquiry into Ms. Kendalla's relationship with Ms. Callada–Ramirez, the INS confiscated Mr. Kendalla's service weapon and reassigned him to work in a Los Angeles office as a file clerk. In December 1994, the investigators filed a report concluding that there was adequate evidence to substantiate Ms. Callada–Ramirez's allegations of on-duty and off-duty misconduct by Mr. Kendalla, including her allegations of sexual encounters during her detention at Terminal Island and of the personal and sexual relationship between the two after her release from detention. The INS report did not, however, include any reference to the alleged shooting incident. After the investigators presented the report, Donald Looney, INS deputy district director, reviewed the report and concluded that the INS should terminate Mr. Kendalla from his position for non-compliance with INS policies and instructions and for engaging in conduct unbecoming of a detention enforcement officer.

In November 1995, while the termination recommendation was still under consideration, the INS, for reasons not explained in the record, returned Mr. Kendalla to his duties and reissued his service weapon. In the meantime, Ms. Vickers

and Mr. Kendalla began living with each other once more. The reconciliation, however, ended in tragedy: After an argument in February 1996, Mr. Kendalla shot Ms. Vickers in the back with his Service-issued revolver. Ms. Vickers sustained serious injuries, some of which may require lifelong care. Mr. Kendalla was arrested following the shooting, and the INS finally dismissed him from his position.

The district court considered Ms. Vickers' tort claims against the INS in light of the FTCA's discretionary function exception, holding that the exception applies and bars the action. In an alternative holding, the district court decided that even if the INS was negligent and its negligence is actionable under the FTCA, its negligent acts and omissions did not, as a matter of law, cause Ms. Vickers' injuries because, among other reasons, Mr. Kendalla could have shot Ms. Vickers with another gun. The court therefore concluded that her claim failed as a matter of law and granted the INS's motion for summary judgment. This appeal followed.

## II.

The Federal Torts Claims Act is a limited waiver of the United States' traditional sovereign immunity, authorizing certain civil tort suits against the government for monetary damages. *See* 28 U.S.C. §§ 2671–2680. Specifically, the FTCA grants federal courts jurisdiction to hear claims for damages

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person,

---

ther and was not a basis of the proposed termination of Mr. Kendalla.

3. Although Ms. Callada–Ramirez did not expressly state that the revolver in question was Mr. Kendalla's Service-issued revolver, the record as a whole indicates that Mr. Kendalla was able to and did take his Service-issued

revolver home with him, and there is no indication that he had any other revolver (although he did have a rifle). In context, the interrogators had every reason to believe that Ms. Callada–Ramirez, a former detainee, was referring to Mr. Kendalla's Service-issued revolver when she spoke of "his revolver."

would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). While the FTCA thereby established "novel and unprecedented governmental liability," *Rayonier, Inc. v. United States,* 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), Congress was careful "to protect the Government from liability that would seriously handicap efficient government operations." *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

The FTCA's principal such protection is the discretionary function exception to liability, barring claims based upon an act or omission of an

> employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*See* 28 U.S.C. § 2680(a). By thus marking "the boundary between [its] willingness to impose tort liability upon the United States and its desire to protect certain government activities from exposure to suit by private individuals," *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), Congress aimed to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Gaubert,* 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

■ The more recent FTCA cases set forth a two-step standard, albeit a fairly general one, for applying the exception: The first inquiry is whether the challenged action involved an element of choice or judgment, for it is clear that the exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to fol-

low." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). If choice or judgment is exercised, the second inquiry is whether that choice or judgment is of the type Congress intended to exclude from liability—that is, whether the choice or judgment was one involving social, economic or political policy. *Id.* Our findings on these questions are crucial in this matter, for if we decide the exception applies to Ms. Vickers' claims, we must dismiss her appeal for lack of jurisdiction. *See Sigman v. United States,* 217 F.3d 785, 793 (9th Cir.2000); *In re Glacier Bay,* 71 F.3d 1447, 1450 (9th Cir.1995).

Ms. Vickers raises two distinct tort claims against the INS on this appeal. First, she contends that the INS negligently supervised and retained Mr. Kendalla. Second, she argues that the INS negligently failed to conduct an investigation into the alleged misuse of Mr. Kendalla's Service-issued firearm. The INS counters that both claims are barred by the discretionary function exception, so we consider in turn whether each claim is thus barred.

**A.**

■ Ms. Vickers first charges that the INS negligently supervised and retained Mr. Kendalla as a detention enforcement officer, citing a series of alleged negligent decisions affecting Mr. Kendalla's employment privileges and status. In particular, the INS allowed Mr. Kendalla to carry a gun although he had missed his most recent round of firearms testing. Furthermore, the INS did not dismiss Mr. Kendalla in light of Ms. Callada–Ramirez's allegations, even though his INS supervisor had determined more than a year before the Vickers shooting that the Callada–Ramirez allegations that had been investigated were true, and had begun proceedings to terminate Mr. Kendalla.

The applicable regulations governing the use of firearms by INS agents require that

Service officers carrying handguns attend and pass a quarterly handgun qualification course. Mr. Kendalla had routinely participated in the course while working for the INS, but the INS excused him when it withdrew his gun during the Callada–Ramirez investigation, and again after it reissued the gun (because he had undergone minor surgery two weeks before the course began). Although the INS scheduled Mr. Kendalla to attend the next quarterly course in March 1996, the agency removed him from duty and took his gun from him after he shot Ms. Vickers in February.

This court and others have held that decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield. *See Gager v. United States,* 149 F.3d 918, 920–22 (9th Cir.1998). *See also Nurse v. United States,* 226 F.3d 996 (9th Cir.2000); *Burkhart v. Washington Metropolitan Area Transit Authority,* 112 F.3d 1207, 1216–17 (D.C.Cir.1997); *Tonelli v. United States,* 60 F.3d 492, 496 (8th Cir.1995); *Richman v. Straley,* 48 F.3d 1139, 1146 (10th Cir.1995); *Attallah v. United States,* 955 F.2d 776, 784–85 (1st Cir.1992). That understanding applies to the contention that the INS negligently trained and supervised Mr. Kendalla with regard to his use of firearms.

The purpose of the handgun qualification course is to insure the proficient use of firearms by INS officers. The INS's decision to excuse Mr. Kendalla was a reasoned choice in light of the unique circumstances. He had demonstrated his proficiency in prior training courses and would be·required to do so again at the next available opportunity. The regulations did not require that Mr. Kendalla pass the proficiency test as a prerequisite to carry a gun, only that he undergo quarterly evaluations.[4] Since the INS reissued his gun shortly before the November course, postponing his participation until March did not materially depart from its gun training program. Thus, the INS's decision to excuse Mr. Kendalla involved a judgment that is subject to the discretionary function exception and is not actionable here.

■ The question of whether the delay in discharging Mr. Kendalla (and therefore taking his service-issued revolver from him) comes within the discretionary function exception is a much closer one. The INS, which has the "burden of proving that the discretionary function exception" applies, *Sigman,* 217 F.3d at 793, has not shown that during the year after Mr. Looney proposed Mr. Kendalla's termination there was *any* decision, discretionary or otherwise, to accept or reject the recommendation. This delay occurred although Mr. Kendalla was given only ten days from receipt of the notice of proposed termination to answer it, and a decision was promised "as soon as possible after your answer is received." The INS's explanation as to why there was nonetheless no decision on the termination recommendation for more than a year after Mr. Looney's letter to Mr. Kendalla was that the regional Labor Management Relations office had a very heavy workload, and final termination decisions were back-logged because of serious staffing shortages.

There is no indication in the record, either, that the INS made any policy-based choice or judgment concerning which termination recommendations to review promptly and which to delay. Indeed, for all the record shows, the Kendalla recommendation was misfiled, forgotten in a pile of paper, or otherwise negligently treated.

■ Under the FTCA, however, negligence in performing discretionary functions is not actionable. *Varig Airlines,* 467 U.S. at 811, 104 S.Ct. 2755. And under the FTCA, to come within the discretionary function exception, "the challenged decision need not actually be

---

4. INS policies expressly allow the Service to excuse employees from quarterly training "for any authorized absence from the officer's official duty station."

grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis." *Nurse*, 226 F.3d at 1001 (internal citations omitted); *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998); *see also Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267 ("The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute or regulation, but on the nature of the actions taken and on whether they are *susceptible* to policy analysis." (emphasis added))

Decisions concerning which termination recommendations to review when and in what order, particularly when faced with staffing shortages and consequent necessary delays, are ones that involve choice or judgment. Those prioritizing decisions are, or should be, "susceptible to policy analysis." Since this matter is one "susceptible to policy analysis" and we have no indication on the record that the INS violated any mandatory policy in failing to act within a reasonable time on the Kendalla termination recommendation, *Nurse, Miller* and *Gaubert* require that we find that the decision concerning the timing of the final termination decision comes within the FTCA's discretionary function exception. *See also Varig Airlines*, 467 U.S. at 817, 104 S.Ct. 2755 (holding that FAA decision to use "spot-check" system to encourage compliance with aircraft lavatory regulations fell within the discretionary function exception).

### B.

Ms. Vickers also contends that the decision whether or not to investigate or report to decision-makers Ms. Callada–Ramirez's allegations that Mr. Kendalla's Service-issued revolver was fired during a dispute between the two is not subject to the discretionary function exception because agency policy required both reporting and investigation of such incidents.

In *Sabow v. United States*, this court recognized that the discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive. 93 F.3d 1445, 1451–54 (9th Cir. 1996). Thus, we can narrow the question before us to whether, as Ms. Vickers contends, investigation into or reporting of Ms. Callada–Ramirez's allegations was mandatory.

■ In an interview with INS investigators, Ms. Callada–Ramirez reported that during a fight with Mr. Kendalla, she had fired his weapon at him and he had fired it at her. The statement at least put the INS on notice that Mr. Kendalla's Service-issued revolver may have been fired in an aggressive or reckless manner during a domestic dispute by one or both disputants.

The statutory authority for INS enforcement personnel, including detention enforcement officers, to carry and use firearms provides that such usage must be governed by "regulations prescribed by the Attorney General." 8 U.S.C. § 1357(a)(5). According to the regulations which were issued pursuant to that statutory directive, such officers may use their firearms *only* if they have "reasonable ground to believe that such force is necessary to protect the designated immigration officer or other persons from the present danger of death or serious bodily harm." 8 C.F.R. § 287.8(a)(2). Any alleged violation of that standard, according to INS regulations, is to "be investigated expeditiously." 8 C.F.R. § 287.10(a). The regulations also direct the INS Commissioner to promulgate guidelines for investigating shooting incidents involving an INS officer. 8 C.F.R. § 287.9(b).

The guidelines the Commissioner promulgated make clear that both on-duty and off-duty shootings are of concern, and are investigated. The INS Administrative Manual provides, for example, that "All incidents involving the discharge of a firearm which occurs during non-duty hours and involve[s] ... [a]ny discharge of a Service-issued or approved firearm except during recreational or sporting activities" are subject to the reporting and investiga-

tion requirements. INS Administrative Manual 4210 § 8(A)(2). The Manual also specifies that after an employee reports an incident, the appropriate official—selected as specified in the manual—is to "immediately initiate the local Service investigation of the shooting incident." *Id.* at § 6(B)(2).

The INS maintains that these reporting and investigation requirements *only* require employees on the scene of a shooting incident, not any other INS employee who learns of the shooting incident, to report it, and—by implication—also do not require investigation of shooting incidents reported by outside complainants. It would be an odd government policy, to say the least, that would rely *solely* on involved employees to report shooting incidents, permitting such incidents to escape mandatory investigation if not reported by those involved. The governing regulations would not appear to permit such a policy limitation, since they prescribe investigations *whenever* there is an alleged violation of the limitations on use of deadly force and implementing firearms policy, not just when the employee himself reports the incident. *See* 8 C.F.R. § 287.9(b) (requiring the Commissioner to promulgate guidelines concerning investigative procedures to be followed after "a shooting incident involving an officer," without limiting the necessary guidelines to investigations to self-reported incidents); 8 C.F.R. § 287.10(a) (alleged violations "of the standards for enforcement activities established in accordance with the provisions of § 287.8"—which include the INS firearms policies established in accord with § 287.8(a)(2), the deadly force provisions— "shall be investigated expeditiously"); 8 C.F.R. § 287.10(b) & (c) (complaints concerning violations of § 287.8—again including violations of the deadly force limitations—"shall be referred promptly for investigation").

Consistent with these general directives, while the Commissioner's firearm guidelines do require "[a]ny employee who discharges a firearm, or is involved in or observes a reportable shooting incident" to report it, there is also more general lan-

guage, quoted above, describing in detail reportable incidents and investigative procedures, without any limitation to self-reported incidents. In particular, those procedures prescribe an elaborate system for supervision of investigations of shooting incidents at the highest level of the Agency. *See* INS Administrative Manual 4210 §§ 1, 6(B) (providing for notification of the Office of the Deputy Commissioner, which shall "direct the Chairman of the Firearms Review Board to review the initial report of the incident to determine the appropriate disposition with regard to the level of investigation," while local officials are at the same time to "initiate the local Service investigation of the shooting incident"). To read this policy as entirely inapplicable when an INS investigator or supervisor learns of a shooting incident which the involved employee did not but *should have* reported would entirely undercut the evident purpose of the guidelines—to assure that the INS investigates *every* nonrecreational shooting incident involving Service personnel for compliance with INS firearms policy. The most sensible interpretation of the involved employee reporting requirement, instead, is that the requirement is an additional one, designed to make it *more* likely that shooting incidents will come to the attention of supervisory personnel, not to absolve INS personnel of the mandatory duty to report and investigate when the information surfaces in some other manner.

The testimony of the INS investigators and supervisory personnel is consistent with this understanding of the regulations and policy guidelines. The investigator in charge of the investigation offered no explanation, when asked, as to why he did not investigate the shooting allegation, saying repeatedly that he had no idea why even Mr. Kendalla was not asked about the shooting allegation. The same investigator said that "if you've learned of an allegation that the employee shot his gun," that "that would be something that would probably be turned over to office of internal affairs" (to which, it appears, that same

investigator was assigned during the Kendalla investigation). Critically, he did not suggest at any point that the reason he did not investigate the shooting incident was because Mr. Kendalla had not reported it.[5]

Moreover, Beverly Wilson, who was a deputy district director at the time of the Callada–Ramirez complaint and drafted for Mr. Looney the recommendation that Mr. Kendalla be terminated on account of the complaint, testified that Ms. Callada–Ramirez's shooting allegations, had she known of them, would have given her cause for concern and would have violated agency policy governing the conduct of detention enforcement officers. Ms. Wilson also stated that, had she known of the shooting allegation, that may have led to "additional investigation into the allegation" at the time the INS reissued Mr. Kendalla his firearm. Again, Ms. Wilson did not in any way indicate that the INS's firearms reporting and investigation policy was simply inapplicable because Mr. Kendalla did not report the incident.

 In sum, although INS investigators undoubtedly enjoy discretion in the conduct of an investigation, this discretion does not extend to the question of whether to report to superiors or to investigate *at all* an allegation of misuse of Service-issued firearms. The failure to report or to investigate therefore constituted a failure to follow the mandatory requirements proscribed by agency regulations as implemented by policy guidelines. Since those regulations and guidelines required investigation and reporting action in the instant case, the FTCA's discretionary function exception does not apply. *See Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267.

Because we conclude that the decision to investigate the shooting incident was not a matter of judgment or choice, we need not proceed to the second part of the FTCA test and determine whether that judgment

or choice was of the type Congress intended to exclude. *See Fang v. United States,* 140 F.3d 1238, 1241 (9th Cir.1998). Rather, we can conclude without more that the INS has not, at the summary judgment stage, met its burden of demonstrating that the discretionary function exception to the FTCA barred Ms. Vickers' claim on this theory of negligence.

### III.

We next turn to the question of causation. Ms. Vickers contends that had the INS conducted an investigation of Ms. Callada–Ramirez's firearms allegations against Mr. Kendalla and found that his INS-issued revolver had indeed been fired during a domestic dispute, the agency would either have terminated Mr. Kendalla or, at least, not have reissued the gun. Since Mr. Kendalla later used that revolver to shoot Ms. Vickers, she concludes that the INS was legally responsible for her injury.

Ms. Vickers' argument raises two questions. First, would an investigation into the alleged Callada–Ramirez shooting incident have resulted in the removal of Mr. Kendalla's Service-issued revolver by the time of the Vickers shooting? Second, was Mr. Kendalla's possession of the revolver a cause in fact and proximate cause of Ms. Vickers' injury?

 We begin from the premise that under California law, the basic causation-related issues involve questions of fact, unless "reasonable [persons] will not dispute the absence of causality." *See Constance B. v. State of California,* 178 Cal.App.3d 200, 207–08, 223 Cal.Rptr. 645 (Cal.Ct.App.1986); *Braman v. State of California,* 28 Cal.App.4th 344, 356, 33 Cal. Rptr.2d 608 (Cal.Ct.App.1994). California applies the "substantial factor" test of legal causation. *See Vesely v. Sager,* 5

---

5. There is nothing in the record that indicates the investigators did not believe Ms. Callada–Ramirez's account of the shooting. Indeed, the record makes clear that the investigators did not believe Mr. Kendalla, and found Ms.

Callada–Ramirez's account of events to be true, with respect to every aspect of their relationship which—unlike the shooting incident—*was* investigated.

Cal.3d 153, 163, 95 Cal.Rptr. 623, 486 P.2d 151 (Cal.1971) ("[A]n actor may be liable if his negligence is a substantial factor in causing an injury.") So, if the question whether "the actor's conduct [was] a substantial factor in bringing about the plaintiff's harm" is "open to reasonable difference of opinion," *Constance B.*, 178 Cal. App.3d at 210, 223 Cal.Rptr. 645, (quoting Restatement Second of Torts, § 434(12)), summary judgment was improper.

### A.

 Whether a proper investigation into Ms. Callada–Ramirez's firearms allegations would have resulted in a decision by the INS resulting in a refusal to reissue Mr. Kendalla his service revolver are questions of fact which, on the present record, there was no basis for resolving against Ms. Vickers, the non-moving party. *See Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 817 (9th Cir.1999) (holding that on summary judgment, the court should construe "all evidence and reasonable inferences it creates in the light most favorable to the non-moving party"); *Sabow*, 93 F.3d at 1450 (noting that in the absence of clear facts to the contrary, the district court should not dismiss a complaint on summary judgment).

Ms. Vickers contends, not unreasonably, that had the INS investigated the earlier shooting and confirmed Ms. Callada–Ramirez's report, it would not have reissued the weapon prior to the February 1996 domestic dispute that ended with her being shot. The present record permits the inference that the INS took the weapon from Mr. Kendalla in the first place because of concerns its investigation raised about his suitability to be in an enforce-

ment position entitling him to carry a firearm. Evidence of his reckless use of a firearm would only have exacerbated those concerns, and quite likely have delayed or prevented his return to an enforcement position triggering issuance of a firearm. The fact that Mr. Kendalla *was* suspended from his detention enforcement position immediately after the Vickers shooting also tends to show that, had the INS investigated and substantiated the Callada–Ramirez shooting incident, it would have taken prompt action resulting in removal of the firearms at that earlier time.[6]

California case law supports Ms. Vickers' theory of causation in this regard. In *Braman*, the California Court of Appeal considered a wrongful death complaint brought by a widow whose husband committed suicide. The husband had a history of mental illness and had been deemed "a danger to himself and to others" under the provisions of California's Welfare and Institutions Code. *Braman*, 28 Cal.App.4th at 347, 33 Cal.Rptr.2d 608. He nonetheless purchased a Rossi .38–caliber revolver from a gun shop in Oakland which he used to fatally shoot himself. Pursuant to California's Dangerous Weapons Control Act (the "Act"), the husband waited 15 days to take possession of the handgun. *See id.* During that time, the Act obligated the state to conduct a background check to determine whether he was eligible to purchase a gun. *See id.* at 348, 33 Cal. Rptr.2d 608. The widow alleged that the state failed to perform its duties under the Act as her husband was clearly ineligible because of his mental illness, and that it was because of the failure to investigate that her husband had the gun with which

---

**6.** A necessary link in any chain of causation supporting liability on the failure-to-investigate theory is that had the INS investigated, it would have concluded that improper use of the INS-issued firearm had in fact occurred during the Callada–Ramirez/Kendalla domestic dispute. The record at this point contains only Callada–Ramirez's statement to that effect, and a denial from Kendalla that he ever hit Callada–Ramirez. The investigators never specifically asked Kendalla about the gun alle-

gation. Under these circumstances, there is at least a conflict in the evidence as to whether the improper gun use occurred, precluding summary judgment on that factual issue. And the plaintiff is entitled at this juncture to the inference that if the gun incident actually occurred, an INS investigation would have so concluded after investigation (as opposed to erroneously concluding that it did not occur). *See Wong*, 192 F.3d at 817.

he killed himself. The Court of Appeal held that the widow's claim raised sufficient questions of fact and reversed the trial court's grant of summary judgment for the state. *See id.* at 356, 33 Cal. Rptr.2d 608.

To conclude that the state's failure to conduct a proper background check could have led to the husband's possession of the gun, the court relied heavily on the policy behind the Act. The legislative history of the Act demonstrated that lawmakers intended to prevent individuals like the husband from having access to firearms. *See id.* at 352–53, 33 Cal.Rptr.2d 608. Because the Act was, in effect, predicated on a causation theory similar to the widow's, her claim stated a viable cause of action.

From the evidence available in this case, a reasonable person could conclude that the policy behind the INS's weapons investigation procedure was to ensure that only qualified personnel carry service weapons and that they only be used for authorized purposes. A fact finder could therefore reasonably conclude that the failure to follow the INS procedures in the instant case caused Mr. Kendalla to have a gun he would not otherwise have had.

### B.

▆ The question then becomes whether, under California law, a fact finder could find that the fact that Mr. Kendalla had an INS-issued gun was a cause-in-fact and proximate cause of Ms. Vickers' injury. The answer, we conclude, is yes.

The *Braman* court noted that the "question of causation in fact can be framed in a variety of ways." *Id.* at 356, 33 Cal. Rptr.2d 608. For example, a trier-of-fact might ask whether Mr. Kendalla would have fired a shot at Ms. Vickers if the INS had not reissued his service revolver, or whether instead he might have "cooled-off" had he not had a gun at his fingertips. A fact finder might consider whether the

INS's failure to investigate and withhold reissuance of the service revolver was a substantial factor increasing the likelihood that Mr. Kendalla would use the gun to shoot at Ms. Vickers. Or the question at trial might be framed as whether the INS could have foreseen that reissuing the service revolver to Mr. Kendalla posed a danger to others and that he might again use the gun in a reckless manner. *Id.*

Considering a similar set of approaches to the causation inquiry, the *Braman* court concluded that whichever way one framed the causation question in the case before it, reasonable persons might answer yes. *Braman* therefore found that there was a viable theory of liability for a jury. *See id.* Similarly, we conclude that the parallel causation questions raised in this case might also be answered affirmatively and thus set aside the grant of summary judgment.

Mr. Kendalla fired the shot with his service weapon, which, according to Ms. Callada Ramirez, he had misused before in similar circumstances. There are factual questions in dispute about the availability of other guns in the house, but the bottom line, both in *Braman* and here, is that the shooter used a gun which he arguably should not have had. The fact that Mr. Kendalla had his own service-issued weapon in his possession at the time of the domestic dispute arguably at least increased the likelihood that he would use a gun violently, and that increase in likelihood of harm is sufficient for tort liability. *See, e.g., Bigbee v. Pacific Tel. & Tel. Co.,* 34 Cal.3d 49, 192 Cal.Rptr. 857, 665 P.2d 947 (Cal.1983).[7] Finally, if at trial it were established that the INS should have known that Mr. Kendalla had used the gun recklessly in the past, then the conclusion that the INS should have foreseen that he might use it in a similar fashion in the future could follow. Because the causation inquiry, however framed, could be answered in the affirmative, summary judg-

---

7. There are various factual matters regarding the Vickers shooting that are not fleshed out in the summary judgment record but which the INS argues are pertinent to the ultimate causation question. Those matters include whether Ms. Vickers' own service revolver was loaded, whether a shotgun found at the

house by police was readily available to Mr. Kendalla, and whether Mr. Kendalla was acting in a moment of rage or in a premeditated manner. As these factual questions are still in dispute, they are not appropriate for summary judgment resolution. *Erickson v. United States,* 976 F.2d 1299, 1302 (9th Cir.1992).

ment was improper.

As to the proximate cause or foreseeability aspect of causation, Ms. Vickers has also made out a sufficient case to avoid summary judgment. Assuming for purposes of this issue that the INS, had it conducted an investigation, would have learned that Mr. Kendalla had used his Service-issued gun in a domestic dispute previously, the INS was on notice that Mr. Kendalla might be prone to so use his gun recklessly. This is not a situation, in other words, in which the government is being held to foresee illegal action by a random member of the public, or by someone of whom it had no reason to suspect a violent propensity.

 Furthermore, it is well established under California law that the criminal or negligent acts of a third party do not break the causal link between the defendant's conduct and the alleged injuries, if the defendant's conduct created or increased the risk of such acts. *See, e.g., Bigbee,* 34 Cal.3d at 58, 192 Cal.Rptr. 857, 665 P.2d 947 (allowing a suit claiming negligent placement of a phone booth to go forward against the telephone company by a plaintiff who was struck while in the phone booth by a negligent driver who veered off the road); *Landeros v. Flood,* 17 Cal.3d 399, 411–12, 131 Cal.Rptr. 69, 551 P.2d 389 (Cal.1976) (allowing a suit claiming medical malpractice to go forward against doctors who failed to properly diagnose "battered child syndrome" and report child abuse to state authorities before subsequent beatings by the parents caused permanent injury to the child); *Weirum v. RKO General Inc.,* 15 Cal.3d 40, 47, 123 Cal.Rptr. 468, 539 P.2d 36 (Cal.1975) (allowing a suit claiming reckless endangerment to go forward against a radio station that organized a game for listeners that allegedly induced two drivers to engage in a high speed chase); *see also, Braman,* 28 Cal.App.4th at 355–56, 33 Cal.Rptr.2d 608.

The underlying criminal act that caused Ms. Vickers' injury was Mr. Kendalla's unlawful use of a firearm. By allowing Mr. Kendalla to carry that firearm, the INS can certainly be said to have increased the risk of the criminal act. This again is a question for trial, rendering summary judgment improper.

## IV.

The district court's order granting summary judgment for lack of jurisdiction over Ms. Vickers' claim of negligent hiring, training and supervision is affirmed. However, because we find that the discretionary function exception does not apply to the claim that the INS was negligent for failing to investigate the shooting and that sufficient question of facts remain as to whether the INS' negligence in failing to investigate was the cause of Ms. Vickers' injury, we conclude that summary judgment was improper. Therefore, the district court's order is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.