Gary GREENE, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. CIV–S–01–0877GGH.

United States District Court, E.D. California.

May 16, 2002.

10. Docket No. 108.

Jeffery Paul Weninger, The Crow Law Firm, Sacramento, for Gary Greene, plaintiffs.

Joseph E Maloney, United States Attorney, Sacramento, for USA, defendants.

*ORDER*

HOLLOWS, United States Magistrate Judge.

*Introduction and Summary*

Whimsical bronze figures, some approximately one and one-half feet high, some smaller, were placed in the courtyard of the newly constructed Sacramento federal courthouse building, the "public egress," as part of the artwork commissioned by the Government Services Administration (GSA). In a scene parallel to the theme of *Back to the Future III,* one of these figures depicts a Native American snapping a photograph of other figures on a public bench, a tourist-like pioneer immigrant and a friendly Native American. The photographing figure was placed in the courtyard itself, some distance from the wall and bench where the pioneer immigrant et al. statuettes were placed. The floor area of the courtyard where the figure was placed contained pavers upon which the public ingress and egress. Nothing else is raised on the pavers except for this figure (and others). In what can only be termed profound irony, a visitor to the federal building (who had worked on the terrazzo floors in the courthouse) was taking a photograph of his wife in the courtyard, when upon backing up for a better shot, he tripped over the figure, itself simulating taking a picture, and injured himself. The unfortunate real-life photographer has sued the United States under the Federal Tort Claims Act for negligent placement of art; the bronze figure apparently remains silent and unhurt.

The United States has brought a motion to be excused from this case based on the discretionary function exception to the FTCA. Upon close analysis, the court denies this motion. Moreover, the government's attempt to claim complete immunity from suit pursuant to 40 U.S.C. § 619(e) is rejected.

*Facts Pertinent to the Discretionary Function and § 619(e) Immunity Defenses*

The facts regarding this defense are in all significant ways free from dispute. Under the Art–in–Architecture program, a small portion of GSA's budget is set aside for the purchase of art for federal buildings. Procedures have been set forth for the selection of art and artists. Those procedures were attached as Exhibit A to the United States' motion. The final decision on art selection is made by officials within the GSA. However, much community input is sought before any decision is made. In this case a Community Arts Panel (CAP) was appointed to make recommendations to the GSA for selection of artists and art.[1] The CAP initially met to develop general criteria for the desired art, e.g., type, location, quality, price and the like. The initial recommendation was then approved, modified, or disapproved by the GSA Source Selection Evaluation Board, and all the details of such approval in this case are not pertinent. After the "concept" approval, CAP went about soliciting artists to present their particular artistic concepts for evaluation for further presentation to the SSEB. To make a long story short, artists for the various projects were finally chosen.

The artist chosen for the sculptures in question, Tom Ottnerness, was given a sum of money for an initial design concept to be presented to the CAP. GSA also authorized a commission option ($225,000) to be exercised in the event that GSA finally selected the work for inclusion at the Federal Building. CAP reviewed the initial sculpture proposals by Mr. Ottnerness but was displeased with his concept (a sculpture chessboard depicting moneyed "valuable" chess pieces opposed by a bunch of pawns). During a subsequent meeting involving the artist's revision of the concept, Judge Coyle (see fn. 1, *supra.*) expressed some concern that the placement of the chess pieces on the courtyard/egress might obstruct the smooth flow of pedestrian traffic. Despite the fact that a majority of the CAP did not oppose the revised concept, Otterness went back to square 1 (not on the chessboard), and presented CAP an entirely new concept using whimsical figures scattered about the courtyard. The court reprints here admitted fact 7 concerning comments on the revised sculptures:

> The climactic CAP meeting, insofar as Otterness' work was concerned, occurred on November 19, 1996. Otterness presented "a model of the entire plaza with the scale and location of his

1. Members of the CAP in this case included two judges of the Eastern District, the Honorable Robert E. Coyle, the former Chief Judge who shepherded the entire building project, and the Honorable John Moulds, a well known person in the Sacramento community, and Sacramento colleague of the undersigned. Comments by these judges on the art work at issue will be set forth, *infra.* The court queried the parties about any possible dispute in this case regarding the participation and credibility of the judges with the caveat that if the comments/decisions of the judges were in any way disputed, or of more value than simply historical interest, the undersigned would not hear this case. The parties assured the undersigned that there would be no such disputes, and the substance of the comments, i.e., what was said, was not in dispute. There has been no request to recuse the undersigned. The undersigned also assures the parties that he was not consulted about the art work in question (or in general). The only contemporaneous art issue recalled by the undersigned involved the propriety of the sayings on the pavers which were subject of comments at several judge's meetings. The undersigned's first contact with the art in question came at the same time as the general public, i.e., when it was placed on the courtyard egress for public viewing. Having reflected on these facts, the undersigned will not presently recuse himself from the case.

proposed work." 151, lines 1 through 3. The model depicted various figures along the waterfall. "In addition to these works, Mr. Otterness has proposed additional elements for the plaza, including a wagon with two oxen, an individual with a burro, and an Indian with a bow and arrow." 151 lines 12 through 14. The trip hazard of placing figures in the plaza itself (as opposed to on the waterfall or the bench adjacent to it) arose as an issue. "In response to questions from Richard Raiser, Mr. Otterness remarked that his work would be fabricated in bronze and that the work on the plaza would be of a size sufficient that someone would not [sic][2] see it and trip over it." 151, First sentence, first full paragraph. Ms. Collette Johnson–Shulke (representing Congressman Matsui's office) "added that she thought Mr. Otterness should be the judge of where his elements should be placed on the plaza. . ." 151, last sentence. Elmo Novaresi (by this time the GSA Regional Arts Officer 150), "added that having additional elements on the plaza would give visitors the opportunity to touch them without getting in the water." 152, Fourth Full Paragraph, lines 10–11. Mr. Dramhoff made certain observations, including having "asked that the placement of the art be a collaborative effort between the architect and artist, not just the decision of the artist." 152, Third Full Paragraph, second sentence. Mr. Kojima [GSA regional representative] "remarked that he had a hard time understanding Mr. Dramhoff's point of view and thought that Mr. Otterness's elements would not obstruct people using or moving through the plaza." 152, Fourth Full Paragraph, last sentence. The Summary of the meeting states that "[w]ith the exception of Mr. Carter [representing the architect], the panel unanimously recommended that the General Services Administration approve the proposal presented by Mr. Otterness." 150, Summary.

Ultimately, on November 19, 1996, CAP approved the artist's concept, and Kenn Kojima recommended approval of the concept to his superior. Based on the favorable recommendation, Robert A. Peck, Commissioner of the Public Building Service, approved the Otterness artwork on February 3, 1997. The final display of artwork differs from the concept approved somewhat in that some of the whimsical figures changed in substance and location. However, the final likeness of the figures and the placement of those figures appear to have been the idea of the artist, and the concept itself remained consistent with that presented to, and recommended by, the CAP. The parties do not relate precisely when the figures were placed in the courtyard, but it appears that placement took place sometime in 1998 or very early 1999.

CAP/GSA did not work in a regulatory vacuum. Several layers of statutes/regulations are pertinent to the analysis here:

(a) Building codes

Each building constructed or altered by the General Services Administration or any other Federal agency shall be constructed or altered, to the maximum extent feasible as determined by the Administrator or the head of such Federal agency, in compliance with one of the nationally recognized model building codes and with other applicable nationally recognized codes. Such other codes shall include, but not be limited to, elec-

---

**2.** Apparently, the artist meant to say that people would see the sculpture and not trip over it.

trical codes, fire and life safety codes, and plumbing codes, as determined appropriate by the Administrator. In carrying out this subsection, the Administrator or the head of the Federal agency authorized to construct or alter the building shall use the latest edition of the nationally recognized codes referred to in this subsection.

40 U.S.C. § 619(a).

Congress reflected its intent that, except where major project or policy considerations conflicted with the codes, GSA was mandated to comply with the codes:

> Currently, it is the General Services Administration's policy to follow local building codes and zoning ordinances to the fullest extent practical and comply with State, local, and Federal regulations to prevent, control, or abate air and water pollution. The bill, in effect codifies this current practice. Local codes which would adversely affect the Government's interest, such as those which restrict competition or limit innovation, are not required to be adhered to by the Administrator. Buildings leased by GSA shall adhere to local codes. However, concern has been expressed about the number of instances in which these codes are not met and the lack of consultation on the part of a Federal agency with the local officials relative to Federal construction and alteration projects. Yet, model building codes constitute private sector standards that the Office of Management and Budget encourages the Federal agencies to use and the Administrator's emphasis on privatization. Accordingly, the bill *requires* that, to the *maximum extent feasible,* each building constructed or altered by a Federal agency *shall comply* with one of the nationally recognized model buildings codes and with other applicable nationally recognized codes and all requirements (other than procedural requirements) of zoning laws and other related State and local laws.

House Report 100–474, 1988 USCCAN 5677, 5681 (emphasis added).

Read in the light of the express Congressional intent, GSA published its own regulation stating that "the objectives of nationally recognized building and performance codes... *will be met and amplified* according to the needs of GSA." 41 CFR § 101–19.002(g) (emphasis added).

The Model Building Code supplied by the government, 1997 Uniform Building Code, Chapter 10[3], indicates that a "means of egress" (defined to include that area from the entrance/exit to the "public way" [street] ) "shall not be interrupted by any building element other than a means of egress component as specified by this chapter." "Obstructions shall not be placed in the required width of a means of egress except projections permitted by this chapter." Section 1003.2.5. *See also* sections 1001.1, 1002, 1003.1, 1003.2.2.2.4, 1006.1, 1006.3.5

*Discussion*

A. *Standard of Review*

■ Discretionary function exception to the FTCA involves the subject matter jurisdiction of the court. *Reed v. United States Dep't. of the Interior,* 231 F.3d 501, 504 (9th Cir.2000); *Vickers v. United States,* 228 F.3d 944, 949 (9th Cir.2000).

---

**3.** The Government's attempt to distance itself from the exhibit at hearing in terms of its applicability or admissibility is puzzling in that the government supplied the exhibit as relevant to the issues herein, and there is no reason to believe that the figures at issue were placed in the courtyard prior to 1997. In any event, because the government bears the burden of proof in establishing the viability of the discretionary function exemption, it could not simply ignore discussion of applicable codes and still meet that burden.

The government has noticed this motion both pursuant to Fed.R.Civ.P. 12(b)(1) (subject matter jurisdiction), and in the alternative, summary judgment. As observed by the government, the most appropriate procedural vehicle to drive the court's decision is Rule 12(b)(1)—especially in that the underlying facts related to assertion of the discretionary function exception are not essentially in dispute.

Under Rule 12(b)(1), the court is not limited to the allegations in the pleadings. *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1558 (9th Cir. 1987) (citing cases). The court may view evidence outside the record, and no presumptive truthfulness is due to the complaint's allegations that bear on the subject matter of the court. *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983). However, in the absence of a full-fledged evidentiary hearing, disputes in the facts pertinent to subject matter are viewed in the light most favorable to the opposing party. *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996).[4] The disputed facts related to subject matter jurisdiction should be treated in the same way as one would adjudicate a summary judgment motion. *Id.* However, neither side herein disputes the chronology of events which led to the choice and placement of the artwork at issue. No one disputes what was said at those CAP meetings where placement of the artwork was briefly discussed. And, the facts upon which the discretionary function exception will be decided are not intertwined with the facts on the merits, i.e., the trip and fall facts, although ultimately dependent on the location of the artwork, are severable from the placement of the art decision. The parties dispute the application of discretionary function law to the known facts.

The government's assertion of statutory immunity pursuant to 40 U.S.C. § 619(e) in any event is a question of law. Although this assertion is more properly brought pursuant to Fed.R.Civ.P. 12(b)(6) (failure to state a claim), the issue can be adjudicated on the facts set forth in the complaint, or in the alternative, summary judgment.[5]

### B. The Law of Discretionary Function

The federal government is liable for common law torts committed by its personnel, but not without exception. One of those exceptions involves discretionary functions of the government. The general law regarding that exception has been set forth in many cases. The explication set forth in *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1173 (9th Cir.2002), captures the essence of the exception:

> The government has not waived its immunity under the FTCA, however, for claims based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

---

4. The rule of *Augustine*—permitting the district court to "rule" on the evidence outside the pleadings regarding jurisdiction, except in situations where the facts on the merits are intertwined with the jurisdictional facts, has seemingly metamorphosed into a rule where the "reviewing court" will presume the jurisdictional allegations in the complaint to be true, *see* e.g., *McLachlan v. Bell*, 261 F.3d 908, 909 (9th Cir.2001); *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir.2001), at least in the absence of an evidentiary hearing where live testimony is taken. The propriety of simply submitting exhibits, with or without declarations, is in some doubt at present.

5. The court need not engage in any lengthy analysis of summary judgment standards given that the question of § 619(e) immunity herein is purely a question of law.

28 U.S.C. § 2680(a). This "discretionary function" exception is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *Gaubert,* 499 U.S. at 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755, 81 L.Ed.2d 660).

\* \* \* \* \* \*

In *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the Supreme Court laid out a two-part test that governs application of the discretionary function exception. First, for the exception to apply, the challenged conduct must be discretionary—that is, it must involve an element of judgment or choice. This requirement is not satisfied—and the suit may therefore proceed—where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "[i]n this event, the employee has no rightful option but to adhere to the directive." *Id.* In short, where alleged conduct violates a mandatory directive, it is not discretionary. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267, 113 L.Ed.2d 335; *In re Glacier Bay,* 71 F.3d 1447, 1452 (9th Cir. 1995). Thus, discretion is the benchmark of this selfreferential prong of the discretionary function test. If the conduct involves choice or discretion, the court must then "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954, 100 L.Ed.2d 531. The focus is on "the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267, 113 L.Ed.2d 335. The decision " 'need not actually be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.' "

*Nurse v. United States,* 226 F.3d 996, 1001 (9th Cir.2000) (quoting *Miller v. United States,* 163 F.3d 591, 593 (9th Cir.1998)). When a statute or regulation allows a federal employee to act with discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267, 113 L.Ed.2d 335.

Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged. *See Glacier Bay,* 71 F.3d at 1451, 1455. The government bears the burden of proving that the discretionary function exception applies. *Reed,* 231 F.3d at 504.

*GATX,* 286 F.3d at 1173–74.

### C. *Application · of the Discretionary Function Exception to This Case*

■ As required, the court first determines whether a mandatory statute or regulation displaces discretion that government officials might otherwise possess in the construction of federal buildings, and specifically, the placement of art objects on the premises of federal buildings. On the present record, the court finds that the United States has not met its burden of proof.

The United States first contends that the controlling statute, § 619(a), in requiring that applicable building standards and codes be utilized "to the maximum extent feasible," gives, and not restricts, GSA discretion. Asserting that "feasibility" is a word essentially meaning "whenever possible," GSA contends that it may deviate from the applicable building code whenever it has good reason to do so. However, such an assertion turns the Congressional requirement on its head. The provisions of building codes are to be complied with in every situation except where it is not

possible to do so.[6] The feasibility exception applies only to those extraordinary situations where major components of a federal project, or the purpose of the federal occupant, would be disturbed by compliance with the codes, e.g., "restrict competition or limit innovation." One need look no further than the legislative history quoted above to understand the nearly complete lack of discretion afforded GSA in adhering to provisions of applicable building codes. Words and phrases such as "requires," "maximum extent" and "shall comply" (emphasized above) do not connote an interpretation that GSA may deviate from the codes absent extraordinary cause. As plaintiff contends, the feasibility exception does not swallow the mandatory rule. If Congress had meant the building codes to be only a discretionary guide, the legislative history, and indeed the words of the statute, would have contained such phrases as "in its discretion," and "if possible" when contemplating the applicability of the building codes. The court need go no further than explicating the Congressional intent to decide the mandatory nature of § 619.[7]

■ Nor does the fact that an exception exists to complete adherence to the building codes require the court to find that GSA has been given significant discretion in the matter. Very few principles, statutes or regulations are expressed in absolute terms—without exceptions or qualifiers. Even fewer are interpreted by courts in such a manner *Cf. Agostini v. Felton,* 521 U.S. 203, 242, 117 S.Ct. 1997, 2020, 138 L.Ed.2d 391 (1997); *Liteky v. United States,* 510 U.S. 540, 559, 114 S.Ct. 1147, 1159, 127 L.Ed.2d 474 (1994). One must look to the nature of the exception or qualifier to determine whether the statutory scheme is permissive or mandatory with very limited exceptions. The court has no difficulty in determining that § 619 falls within the latter category.[8]

■ Even assuming that the issue here requires looking past the words of the statute and the clear Congressional intent as set forth in the legislative history, on towards the interpretation of the agency tasked with implementation of the statute, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the United States' position herein is not

**6.** Also, one could argue from the words of the statute that only the Administrator of GSA or a federal agency head has the authority to deviate from the building codes. However, plaintiff does not make this argument, and the court need not rely on it.

**7.** The government cites three cases, which in its view necessitate a finding of discretion whenever agency action is directed "to the extent practical." *Rosebush v. United States,* 119 F.3d 438, 442 (6th Cir.1997); *Madison–Hughes v. Shalala,* 80 F.3d 1121, 1126 (6th Cir.1996); *Cope v. Scott,* 45 F.3d 445, 450 (D.C.Cir.1995). The language in *Rosebush* and *Cope* found in their agency regulations or guidelines at issue is much less demanding than the statutory language in this case. Although the regulatory language in *Madison–Hughes,* when viewed in isolation equals the language of the controlling statute herein, the

*Madison–Hughes* court utilized the "to the fullest extent practicable" language to reinforce its belief that action other than that required by the quoted regulation was discretionary. But most importantly, none of the cases' directives encompassed legislative history, like that here, which itself demonstrated the relative lack of discretion committed to the agency.

**8.** Thus, the undersigned does not follow *Schuyler v. United States,* 987 F.Supp. 835, 842 (S.D.Cal.1997) on this point. That court in construing § 619(a) did not refer to its legislative history, a referral which is important to the analysis. Moreover, if relegated only to the plain meaning of the statute, the undersigned would not find that the statute was designed to afford discretion as opposed to restricting it.

upheld. The GSA regulation at issue provides that the building codes "will be met and amplified according to the needs of GSA." A requirement that the codes "will be met" is not difficult to decipher. "Amplify" means to make "larger or stronger; increase or extend," "to develop more fully." *Webster's New World Dictionary,* Third College Edition (1988). How the United States interprets "amplify" as meaning essentially "discretion to ignore" is unclear.

■ Thus, in the present case, GSA was tasked with following the applicable building codes in the absence of a situation where compliance was simply not possible as determined by the Administrator. There is no evidence that such a situation existed. Nevertheless, the statute/regulation discussed above is not applied in a vacuum. There must be an applicable building code, and the United States supplied the 1997 edition of the Model Building Code as the pertinent code, if pertinent at all. As correctly observed by the United States, "all that can be ascertained with any confidence from reading it [the building code] is that its proper interpretation is no matter for an amateur;" however, neither of the parties supplied any expert interpretation of these code sections, or any code sections. Nevertheless, in light of the burden of proof for the discretionary function defense (on the United States), at this juncture, the court finds that 1997 Model Building Code section 1003.2.5 (quoted above) arguably applies to the situation where a small statute is placed in an area where the public walks and loiters on the way to the street. If the United States believed otherwise, it was incumbent upon the United States to present expert testimony to that effect. Thus, upon the present record, the court finds that the 1997 Model Building Code forbade free standing placement of "interruptions" or "obstructions" in any pathway between the doors and the public street. The Na-

tive American *"Back to the Future"* photographer was one of those interruptions and/or obstructions.

■ Even if the court has interpreted the 1997 Model Building Code incorrectly, the court finds that the decision to place the sculptures in the courtyard/pathway was not a decision sufficiently based on policy to warrant application of the discretionary function exception. "The [discretionary function] exception is meant to protect 'political, social, and economic judgments' that are the unique province of the Government, *not all decisions involving some discretion."* *Bear Medicine v. United States,* 241 F.3d 1208, 1214 (9th Cir.2001) (emphasis added).

First, the court identifies the decision at issue. Of course, the decision to choose one piece of artistic expression over another, be it sculpture or two dimensional art, is not at issue here. Neither is the decision to choose a particular artist relevant to the inquiry here; the same is true for the decision to have art at all. Thus, the government's lengthy discussion of GSA discretion in art purchasing or commissioning is a bit of a strawman. Rather, it is the placement of the art in a place of ingress/egress which is the pertinent focus of this case. The court is not concerned at this point whether the decision was a good or bad one.

One could not seriously argue that a decision to hang artwork in an area where it might be jostled by the public thereby causing injury is the type of decision involving the "unique province of the Government." The issue here is closer in that the type of artwork under consideration, individual sculptures which are integrally related to one another thereby fashioning a collective artwork, involves spatial relationships as part of the artist's expression. Thus, location of the three dimensional pieces is part of the artwork in a larger

sense than the mere hanging of a painting. However, the artist is not being sued for his expression, and again, the decision of the government to permit the placing of the sculptures where they were ultimately placed is the decision at issue. While this decision was born in part by a reluctance of the CAP (and presumably the GSA decisionmaker) not to unduly interfere with artistic expression, we are nevertheless not dealing with any type of discretion exercising situation which warrants immunizing the government from allegedly negligent acts. Yes, one can argue in the absence of a binding code provision that some discretion was involved in the CAP/GSA decision, but as *Bear Medicine* points out, something more is needed for a grant of FTCA tort immunity. Pared to its essence, this was, after all, a GSA decision concerning the location of artwork.

The court is not finding that building aesthetics never involve discretionary decision of sufficient magnitude to warrant application of the FTCA discretionary function exception. Several cases have shown aesthetics to be sufficiently weighty to require the FTCA exception. *See e.g., Chantal v. United States,* 104 F.3d 207 (8th Cir.1997) (design of stairs at the Jefferson National Expansion Memorial, St. Louis Missouri); *Schuyler v. United States,* 987 F.Supp. 835, 843–44 (S.D.Cal. 1997) (not enclosing entire ramp of site with a fence). However, in these cases, as in others, the design in question either involved the construction itself in a major fashion (*Chantal*), or the decisonmakers expressed a governmental interest in permitting the omitted safety feature (*Schuyler*) (the expressed desire not to have the public repelled by government construction with a fortress type mentality). No such governmental interests are involved here. While art beautifies federal buildings, and the display of such per se is

deemed governmentally important[9], it cheapens the discretionary function to depression-like currency to find that art location decisions are unique to governmental function, and deserve immunity.

### D. *The Section 619(e) Immunity*

 Citing to 40 U.S.C. § 619(e), in its Reply, the government essentially contends that it is completely immunized from any construction defect precipitated by its negligence. An issue raised for the first time in a reply brief is not properly before the court. *United States v. Downin,* 884 F.Supp. 1474, 1480 (E.D.Cal.1995). In any event, because this statutory assertion could again be raised at trial, the court reviews it herein. The government's all encompassing immunity assertion is not borne out by the language of the partial immunity:

Effect of noncompliance

No action may be brought against the United States and no fine or penalty may be imposed against the United States for failure to meet the requirements of subsection (a), (b), or (c) of this section or for failure to carry out any recommendation under subsection (d) of this section.

40 U.S.C. § 619(e).

 Quite clearly, the statute does not immunize the United States from all and every construction defect no matter how one seeks to remedy the defect. Rather, the language of the statute simply precludes an action based on a violation of the mentioned subsections. In this case, that means no action may be based on a failure to follow the building codes as discussed above, i.e., no negligence per se finding is available. To hold that the statute gives a blanket construction immunity goes far beyond the plain meaning of the statute. Once again, the United States relies on

---

**9.** 41 C.F.R. § 101–19.002(m).

*Schuyler v. United States, supra,* the only case to the knowledge of the parties or the undersigned to discuss this subsection. However, the undersigned again respectfully disagrees that *Schuyler* controls. The *Schuyler* decision, 987 F.Supp. at 844, stated that the subsection precluded any action "arising out of" a violation of building codes. However, the words "arising out of" do not appear anywhere in the statute and import a judicial gloss that far exceeds what the statute actually provides. If Congress had desired to completely immunize the United States from any action involving building code violations, it would have utilized the precise words of the *Schuyler* decision. However, only actions "brought against the United States" "for failure to meet the requirements of subsection (a)...." are banned. Actions based upon common law negligence, such as the FTCA, are not referenced, and do not depend upon a finding that a building code violation occurred. Negligence can be actionable regardless of compliance with a building code. *Amos v. Alpha Property Management,* 73 Cal.App.4th 895, 901, 87 Cal.Rptr.2d 34, 38–39 (1999).[10]

*Conclusion*

The motion of the United States to dismiss, or in the alternative, for summary judgment is denied. The parties shall file a joint statement with the court within ten days from the filed date of this order suggesting dates for final resolution of this lawsuit as well as discovery, expert and motion cutoff dates. The court will thereafter issue a final scheduling order on this case.

---

10. California law would be applied to the substantive tort claim in this FTCA action.