**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

GINA M. GONZALEZ, personally and as next best friend of A.F., a minor,
    *Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,
    *Defendant-Appellee.*

</td>
<td>

No. 13-15218

D.C. No.
4:12-cv-00375-
JGZ

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, District Judge, Presiding

Argued and Submitted
March 12, 2015—San Francisco, California

Filed February 24, 2016

Before: Marsha S. Berzon, Jay S. Bybee,
and John B. Owens, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Berzon

**SUMMARY**[*]

**Federal Tort Claims Act**

The panel affirmed the district court's Fed. R. Civ. P. 12(b)(1) dismissal for lack of subject matter jurisdiction over this Federal Tort Claims Act ("FTCA") case based upon the discretionary function exception.

The discretionary function exception of the FTCA immunizes the federal government from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" on the part of the government. 8 U.S.C. § 2680(a).

Plaintiffs alleged that the FBI learned of communications among members of the Minutemen American Defense, an activist group that advocated against illegal immigration and that patrolled the U.S.-Mexico border. Plaintiff's home was subsequently invaded and members of her family were murdered by members of the Minutemen group. Plaintiff alleged that the FBI negligently failed to disclose the information about the impending home invasion to local law enforcement, in contravention of the Attorney General's Guidelines for Domestic FBI Operations.

The panel held that under the Attorney General Guidelines, the FBI's failure to disclose information to local law enforcement regarding a home invasion threatened by private persons against unspecified victims constituted a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

"failure to exercise or perform a discretionary function or duty" pursuant to § 2680(a) of the FTCA, and therefore the discretionary function barred plaintiff's suit. The panel also held that the district court did not abuse its discretion in denying plaintiff's request for jurisdictional discovery.

Judge Berzon dissented because she would hold that the conduct challenged here – the FBI's failure to disclose information to local law enforcement agencies – was not shielded by the discretionary function exception, and she would allow plaintiff's claim for compensation to go forward.

---

## COUNSEL

Thomas G. Cotter (argued) and Stanley G. Feldman, Haralson, Miller, Pitt, Feldman & McAnally, P.L.C., Tucson, Arizona, for Plaintiffs-Appellants.

Steve Frank (argued) and Mark B. Stern, Appellate Staff Attorneys; Stuart F. Delery, Assistant Attorney General; John S. Leonardo, United States Attorney; United States Department of Justice, Civil Division, Washington, D.C., for Defendant-Appellee.

**OPINION**

BYBEE, Circuit Judge:

The discretionary function exception of the Federal Tort Claims Act ("FTCA") immunizes the federal government from claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" on the part of the government. 28 U.S.C. § 2680(a). We consider whether, under Attorney General guidelines, the FBI's failure to disclose information to local law enforcement regarding a home invasion threatened by private persons against unspecified victims constitutes a "failure to exercise or perform a discretionary function or duty" pursuant to § 2680(a), barring Gonzalez's suit. We hold that the FBI's decision whether or not to disclose was discretionary, and we affirm the judgment of the district court dismissing the suit.

I

A. *Factual Allegations*

Plaintiffs-Appellants Gina Gonzalez and her minor daughter, A.F. ("Gonzalez"), allege that in April 2009, the FBI learned of communications among members of the Minutemen American Defense, an activist group that advocates against illegal immigration and patrols the U.S.-Mexico border for illegal crossings.[1] That month, Shawna

---

[1] When a defendant brings a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and asserts that the allegations in the plaintiff's complaint are insufficient to establish subject matter jurisdiction as a matter of law, we take the allegations in the plaintiff's complaint as true. *Whisnant v. United States*, 400 F.3d 1177, 1179 (9th Cir. 2005).

Forde called Ronald Wedow, another member of the Minutemen in Arizona, and told him that she knew someone in Arivaca, Arizona who would provide her with "information about illegal immigrants." Wedow passed this information along to his friend Robert Copley, who spoke with Forde several times over the course of that month. Forde told Copley that the Minutemen planned to conduct an "operation" in Arivaca, in which they would invade a home to steal drugs, weapons, and money.

At Forde's request, Copley set up a meeting in Aurora, Colorado at a Flying J truck stop to recruit individuals for the operation. But Copley, unbeknownst to Forde, had contacts at the FBI. And after setting up the Aurora meeting, Copley informed his FBI contact, Agent Chris Andersen, of the meeting. He asked Agent Andersen to send an undercover FBI agent to the meeting. Andersen declined, but instructed Copley to attend, gather information, and report back.

The meeting in Aurora took place on May 15, 2009. Forde, Copley, Wedow, and several others attended. Forde described her plan to invade a home in Arivaca, which she believed to be a crossroads for drug and weapons trafficking, for the purpose of "securing" it and stealing contraband that she suspected would be inside. She explained that her plan involved forming two "crews": the first to "secure" the residents of the home, and the second to steal the drugs, weapons, and cash. She then drew a map of the area where the target home was located.

Following the meeting, Copley reported to Agent Andersen. He informed Agent Andersen of Forde's plan to "secure" the residents of the home, explaining that "securing" meant "hitting the house like a SWAT team . . . going in

armed." Copley told Andersen that he considered the threat posed by the planned invasion to be "real and imminent." He also provided Andersen with the map showing the approximate area of the attack. Gonzalez alleges that Andersen provided the map to the Phoenix FBI office but that the map was lost in Phoenix. She also alleges that the FBI never alerted local law enforcement in Arivaca—the Pima County Sheriff's Department—of any of this information.

Fifteen days after the Aurora meeting, on May 30, 2009, three masked intruders entered Gonzalez's home in Arivaca in the early morning hours. They fatally shot Gonzalez's husband, Raul Flores, in view of Gonzalez and their nine-year-old daughter, B.F. They then wounded Gonzalez, shooting her in the shoulder and leg. Finally, a gunman reloaded his weapon and shot B.F. in the face, killing her instantly. The intruders withdrew from the home. Gonzalez crawled to the next room, grabbed her husband's handgun, and called 911. While she was on the 911 call, a gunman returned and attempted to shoot Gonzalez again, and Gonzalez shot him in the leg. The intruder's injury eventually led to the identification, arrest, and prosecution of the three perpetrators. One of them was Shawna Forde.

B. *Proceedings*

Gonzalez filed a complaint in U.S. District Court for the District of Arizona on behalf of herself and her surviving daughter, A.F., who was at her grandmother's house at the time of the attack. The complaint alleged that the United States is liable under the FTCA for damages arising out of the attack because the FBI negligently failed to disclose the information about the impending home invasion to local law enforcement, in contravention of the Attorney General's

Guidelines for Domestic FBI Operations ("Guidelines"). Section VI(C)(2) of these Guidelines provides that the FBI "shall promptly transmit" to local law enforcement information concerning "serious criminal activity not within the FBI's investigative jurisdiction," unless disclosure would compromise an ongoing investigation, endanger others, or reveal privileged information. Gonzalez and A.F. sought damages for the wrongful death of Raul Flores and B.F. Gonzalez also sought damages for her own personal injuries, pain, and suffering.

The United States filed a motion to dismiss, arguing, among other things, that the court lacked subject matter jurisdiction over this FTCA case because of the discretionary function exception. The district court granted the motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The court denied Gonzalez's request for jurisdictional discovery as futile. *Gonzalez v. United States*, No. CV 12-00375, 2013 WL 308762, at *7–8 (D. Ariz. Jan. 25, 2013). Gonzalez filed a timely appeal to this court.

II

The FTCA authorizes private suits against the United States for damages for loss of property, injury, or death

> caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the

law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  The Act operates as a limited waiver of sovereign immunity from suits for negligent or wrongful acts of government employees, *United States v. Gaubert*, 499 U.S. 315, 318 n.4 (1991), which constitute "ordinary common-law torts," *Dalehite v. United States*, 346 U.S. 15, 28 (1953).  *See* 28 U.S.C. § 2674 (the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances").

There are several exceptions to the FTCA.  The exception relevant for our purposes is the discretionary function exception, which provides that the government has not waived immunity for claims

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved [is] abused.

28 U.S.C. § 2680(a).  This exception "prevent[s] judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).  The "discretion protected by [§ 2680(a)] . . . . is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law."  *Dalehite*, 346 U.S. at 34 (internal quotation marks omitted).

Accordingly, "[w]here there is room for policy judgment and decision there is discretion." *Id.* at 36. The government bears the burden of demonstrating that the discretionary function exception applies. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002). Where the exception applies, the United States has not waived its sovereign immunity and we lack subject matter jurisdiction over the claims. *Id.* at 1173; *see United States v. Sherwood*, 312 U.S. 584, 586 (1941); *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 924 (9th Cir. 2009) (explaining that the FTCA waiver of sovereign immunity is coextensive with the conferral of jurisdiction (citing 28 U.S.C. § 1346)).

The Supreme Court has prescribed a two-part test for determining whether the discretionary function exception applies. *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988). First, courts are to ask whether the challenged action was a discretionary one—"that is, it must involve an element of judgment or choice." *GATX/Airlog Co.*, 286 F.3d at 1173 (citing *Berkovitz*, 486 U.S. at 536). In addition to duties prescribed by the common law torts "of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), federal employees must follow "federal statute[s], regulation[s], or polic[ies that] specifically prescribe[] a course of action for an employee to follow," *GATX/Airlog Co.*, 286 F.3d at 1173. In such cases, "the employee has no rightful option but to adhere to the directive," and the discretionary function exception does not apply. *Id.* at 1174. Thus, where conduct violates a mandatory directive and is not "the product of judgment or choice," it is not discretionary. *Berkovitz*, 486 U.S. at 536. This step is called the "discretionary act" prong of the discretionary function exception analysis. *See Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996).

If the conduct involves an element of judgment, the court then determines "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.  The focus of this second step is "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation," but rather "on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. "The decision need not *actually* be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis." *GATX/Airlog Co.*, 286 F.3d at 1174 (internal quotation marks omitted).  According to the Court, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324. Thus, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.*  We refer to this as the "policy judgment" prong.  *See Sabow*, 93 F.3d at 1451.

## III

We begin with the first prong of the discretionary function exception analysis, the discretionary act prong.  We first address whether the Guidelines impose upon FBI agents a mandatory duty to disclose information to local law enforcement.  Because Gonzalez also contends that additional discovery would have helped her show the mandatory nature of the Guidelines, we also discuss whether the district court abused its discretion in denying Gonzalez further discovery.

Concluding that the FBI has discretion in its investigative decisions, we then turn to the policy judgment prong.[2]

A. *Discretionary Act*

    1. The FBI's decision whether or not to disclose information regarding potential threats is discretionary

We first consider whether the challenged government action involves discretion. There is no common law analog in tort law. Thus, we are looking to see if there is some kind of "federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536.

We know of no statute or regulation—and Gonzalez has not directed us to any—that prescribes a course of action for the FBI and its agents to follow in the investigation of crime. This is not surprising. The investigation and prosecution of crime has long been a core responsibility of the executive branch. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) ("One of the first duties of government is to afford . . . protection."); *see also Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (No. 3,230) (Washington, J.) (The fundamental privileges of citizenship include "[p]rotection by the government"). Outside of the FTCA context, the "Court has recognized on several occasions over many years that an

---

[2] We review de novo a dismissal for lack of subject matter jurisdiction under the FTCA. *Green v. United States*, 630 F.3d 1245, 1248 (9th Cir. 2011). Denials of motions to compel discovery are reviewed for abuse of discretion. *Dichter-Mad Family Partners, LLP v. United States*, 709 F.3d 749, 751 (9th Cir. 2013) (per curiam).

agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). "This recognition . . . is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement." *Id.*; *see Wayte v. United States*, 470 U.S. 598, 607 (1985) ("[T]he decision to prosecute is particularly ill-suited to judicial review. . . . [T]he Government's enforcement priorities, and . . . overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."); s*ee also Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976) (preparation for indictment involves the "obtaining, reviewing, and evaluating of evidence," which requires "mak[ing] decisions on a wide variety of sensitive issues").

Gonzalez has argued, nevertheless, that the Attorney General has prescribed guidelines for the conduct of investigations that supply a mandatory duty applicable to the FBI agents involved here. Section VI(C)(2) of the Attorney General's Guidelines for Domestic FBI Operations governs the FBI's disclosure of information to local law enforcement. Under the portion titled "Criminal Matters Outside FBI Jurisdiction," the Guidelines state in relevant part:

> When credible information is received by an FBI field office concerning serious criminal activity not within the FBI's investigative jurisdiction, the field office shall promptly transmit the information or refer the complainant to a law enforcement agency having jurisdiction, except where disclosure would jeopardize an ongoing investigation,

endanger the safety of an individual, disclose the identity of a human source, interfere with a human source's cooperation, or reveal legally privileged information.  If full disclosure is not made for the reasons indicated, then, whenever feasible, the FBI field office shall make at least limited disclosure to a law enforcement agency or agencies having jurisdiction, and full disclosure shall be made as soon as the need for restricting disclosure is no longer present.

Guidelines § VI(C)(2).  The district court concluded that in spite of mandatory-sounding language—"the field office *shall* promptly transmit"—the Guidelines "as a whole, . . . as well as the factors set forth for consideration, clearly refute[] the conclusion that Guideline § VI(C)(2) mandated disclosure." *Gonzalez*, 2013 WL 308762, at *5.  The court observed that an FBI agent must decide whether the information is credible, whether the criminal activity is serious, and whether there is any other reason relating to the FBI's other operations that counsels against transmitting the information.  *Id.*

In our view, the district court correctly concluded that the Guidelines do not prescribe a mandatory course of conduct with respect to the FBI's sharing of information with state or local law enforcement agencies.  Law enforcement officers must regularly make judgment calls with respect to information sharing.  They must consider the source of the information, its credibility, and the amount of detail in the information.  FBI agents, like detectives and police officers, must evaluate whether the information requires immediate action, deferred action, or no action at all.  They have to make myriad judgments about how the potential for future criminal

activity fits the agency's mission and enforcement priorities. Indeed, agents may disagree among themselves about the significance or credibility of information they receive. None of the answers to these questions are dictated by the Attorney General's Guidelines. The Guidelines provide no criteria for determining what is "credible information" or what constitutes "serious criminal activity." Courts have consistently held that where, as here, a government agent's performance of an obligation requires that agent to make judgment calls, the discretionary function exception applies. *See, e.g.*, *Conrad v. United States*, 447 F.3d 760, 765–66 (9th Cir. 2006) (holding that where a criminal procedural rule provided that the government "*must* take the defendant *without unnecessary delay*" before a judge, the "exercise of judgment" was required in determining "how much delay is necessary"); *Ochran v. United States*, 117 F.3d 495, 500–01 (11th Cir. 1997) (holding that Attorney General Guidelines for witness protection were discretionary; "[e]ven though the Guidelines require the AUSA to arrange for the reasonable protection of a victim who is threatened, they did not specify *how* this protection is to be provided"); *Kelly v. United States*, 924 F.2d 355, 358, 360–61 (1st Cir. 1991) (holding that where a DEA manual provided that any bureau chief receiving an "allegation or complaint" indicating a possible leak of confidential DEA information "will [i]mmediately notify" internal security personnel, bureau chiefs had "discretion to determine what comprised an 'allegation' or 'complaint'").

Even if an agent receives information that is credible and suggests serious criminal activity, an agent may choose not to disclose information based on his consideration of the possible effects of disclosure, such as the effect of disclosure on an informant, other individuals, or an ongoing

investigation.  An FBI agent must first weigh these various considerations, each committed to his discretion, before he "shall promptly transmit the information."  Additionally, "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations."  *Sabow*, 93 F.3d at 1453; *cf. Vickers v. United States*, 228 F.3d 944, 953 (9th Cir. 2000) (concluding that a regulation requiring prompt investigation of an allegation of misuse of Service-issued firearms is mandatory; "although INS investigators undoubtedly enjoy discretion in the conduct of an investigation, this discretion does not extend to the question of whether to report to superiors or to investigate *at all* an allegation of misuse of Service-issued firearms").  Viewed in context, mandatory-sounding language such as "shall" does not overcome the discretionary character of the Guidelines.

Gonzalez argues that while the Guidelines permit the FBI to make partial disclosure of information, the Guidelines do not permit the FBI to fail to warn entirely.  However, nothing in the Guidelines supports Gonzalez's interpretation.  The predicate for any action by an agent is a judgment that the FBI has come into "credible information."  Only if the agent makes that decision—a decision fraught with judgment based on context, experience and expertise—does the Guideline even apply.  Only then do the Guidelines state that an officer "shall promptly transmit the information."  Even then, the Guidelines provide an exception: "*except* where disclosure would" implicate any of the five circumstances listed, suggesting that in those circumstances, disclosure is not required.  Furthermore, the Guidelines provide that if disclosure is not made for any of those reasons, then partial disclosure shall only be made "whenever feasible"—another judgment call.  The dissent argues that "*any* regulation that

sets out criteria for action" requires government officials to determine "whether those criteria are or are not satisfied," and that this does not render an otherwise mandatory policy discretionary. Dissenting Op. at 34. That may be true. But that argument ignores the specific regulations at issue here. The FBI's Guidelines clearly contemplate everything from full disclosure to partial disclosure to non-disclosure, thus giving the agents discretion to make a "case-by-case evaluation" regarding the need to disclose. And, as we said in *Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993), "A 'case-by-case' evaluation presumes significant officer discretion."[3] The district court properly concluded that the Guidelines do not prescribe a mandatory duty.

---

[3] Cases like *Tobar v. United States*, 731 F.3d 938 (9th Cir. 2013), in which officials are required to determine the existence of objective, independently ascertainable conditions, are inapposite here. As the dissent observes, the fact that a Coast Guard enforcement manual requiring the owner of a vessel to be compensated *if* there are no drugs on board and the vessel is damaged, *see Tobar*, 731 F.3d at 946, does not give Coast Guard officials "discretion" just because it requires the officials to exercise some judgment in determining whether the conditions of the rule apply. *See* Dissenting Op. at 34–35. But the dissent ignores the fact that judgments regarding compensation to be paid to vessel owners required in *Tobar* and judgments regarding what investigative evidence should be passed on to other offices and local offices in the FBI's Guidelines are completely different in kind. The criteria agents must consider in determining whether to disclose information involve exactly the kind of policy judgments to which the discretionary function exception applies, as we discuss in detail in Part III.B. The fact that the "structure"—the logical form—of the Guidelines here and the Coast Guard's manual at issue in *Tobar* is "identical" does not render the Guidelines here automatically mandatory. Dissenting Op. at 35.

2. The district court did not abuse its discretion in denying discovery

Gonzalez requested "discovery regarding the policy set forth in the Attorney General's Guidelines for Domestic FBI Operations, § VI(C)(2), including any agency interpretations of that rule and the custom and practice of how that rule is obeyed." The district court denied Gonzalez's request, concluding that the text of the Guidelines makes clear that it permits agency discretion, and thus efforts to obtain evidence regarding the custom and practice of how that rule is obeyed would be futile. *Gonzalez*, 2013 WL 308762, at *8.

On appeal, Gonzalez contends that the district court abused its discretion when it denied her leave to take jurisdictional discovery. To show that she was prejudiced by that denial, Gonzalez seeks to supplement the record with a document called the FBI Domestic Investigations and Operations Guide ("DIOG"), which was published in 2011. The DIOG provides, in relevant part:

> [W]hen an employee has information that a person . . . who is identified or can be identified through reasonable means is subject to a credible threat to his/her life or of serious bodily injury, the employee must attempt expeditiously to notify other law enforcement agencies that have investigative jurisdiction concerning the threat.

DIOG § 14.7.3.2.1.1 ("Threats to Intended Persons"). The DIOG further provides that "[w]henever time and circumstances permit, an employee's decision not to provide notification to another law enforcement agency in the

foregoing circumstances must be approved by an ASAC or higher." *Id.* § 14.7.3.2.2. Though the 2011 DIOG was created and published after the home invasion occurred in 2009, Gonzalez offers some evidence to suggest that the DIOG "incorporates several older, separate policies" dating back to 2008. Gonzalez did not raise the relevance of the DIOG with the district court.

Absent extraordinary circumstances, we generally do not permit parties to supplement the record on appeal. *United States v. Boulware*, 558 F.3d 971, 976 (9th Cir. 2009); *Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). Gonzalez has not demonstrated that extraordinary circumstances are present here.

Even if we were to consider the DIOG, Gonzalez's prejudice argument is tenuous. To be sure, like the Attorney General's Guidelines, the DIOG employs some mandatory-sounding language. However, granting Gonzalez the assumption that the relevant language in this 2011 document applied at the time of the 2009 home invasion, the DIOG is replete with discretionary determinations. The threat must be "credible," and the threat must be against a "person who is identified or can be identified through reasonable means." Even if these criteria are satisfied, the employee must "attempt expeditiously" to contact other law enforcement agencies. This is not the language of "a specific statutory [or] regulatory directive." *Berkovitz*, 486 U.S. at 542–43. And in this case, there is no allegation that Agent Andersen had any specific identifying information about any potential victims. The complaint stated only that Copley gave Agent Andersen a map showing the "approximate location" of the targeted home, and gave no indication that this map afforded the FBI "reasonable means" by which to identify the targeted victims.

Thus, even if we were to consider the DIOG, the document does not show that Gonzalez was prejudiced by the district court's denial of discovery. The district court did not abuse its discretion.

## B. *Policy Judgment*

We turn next to the policy judgment prong of the discretionary function exception analysis. Under this prong, we address whether FBI decisions made pursuant to the Guidelines are susceptible to policy judgment. We then address whether the "design-implementation" distinction applies here.

1. The FBI's decision whether to disclose information is the type of decision that Congress intended to shield from FTCA liability

Under the policy judgment prong, we assess whether the challenged conduct involves the exercise of policy judgment. In determining if the conduct involves policy judgment, we do not look to an agent's subjective weighing of policy considerations. Rather, we examine the nature of the Government's action—or in this case, omission—and decide whether it is "susceptible" to policy analysis under an objective assessment. *Gaubert*, 499 U.S. at 325.

Because we conclude above that the Guidelines permit discretion, a "strong presumption" arises that the FBI's actions were grounded in policy considerations. *Id.* at 324. Therefore, we must presume that when the FBI declined to disclose information regarding the Minutemen threat to local law enforcement, its actions resulted from a policy judgment. *See, e.g.*, *Alfrey v. United States*, 276 F.3d 557, 564 (9th Cir.

2002) (concluding that because "federal regulations expressly give prison officials discretion in how to respond to reports of threats[,] . . . . it must be presumed that the officials' choices in responding to the report of [an inmate's] threat were based in public policy").

Even absent that presumption, the FBI conduct challenged here clearly involves the type of policy judgment protected by the discretionary function exception. The investigation of crime involves policy judgments at the core of the executive branch. In investigations, no less than prosecutions, the executive must consider the reliability of the information, the relative importance of the crime, and the agency's mission and resources. *See Red Lake Bank of Chippewa Indians v. United States*, 800 F.2d 1187, 1193, 1198 (D.C. Cir. 1986) (holding that where FBI allegedly received "warnings that something might happen" and "failed to make adequate plans" to prevent a violent confrontation on Native American land, the discretionary function exception applied because "[l]aw enforcement personnel receive warnings, rumors and threats all the time [and] are constantly required to assess the reliability of the information they receive, and to allocate scarce personnel resources accordingly"). As the Guidelines make evident, any agent choosing whether to disclose information must weigh the credibility and seriousness of the threatened criminal activity against the possible risks—to an informant, if disclosure might reveal his cooperation with the government; to an intended victim, if disclosure might put him in greater danger; to other potential victims, if disclosure might also endanger them; or to ongoing investigations, if disclosure might jeopardize their success. These considerations surely implicate social, economic, and political judgments. *See Varig Airlines*, 467 U.S. at 814. Thus, the FBI's nondisclosure of information is the type of

conduct to which a policy analysis could apply. *See Weissich v. United States*, 4 F.3d 810, 813 (9th Cir. 1993).

Our conclusion finds support in our decision in *Alfrey v. United States*. There, the wife of a prison inmate alleged that prison officials responded negligently to threats by her husband's cellmate, resulting in her husband's death. 276 F.3d at 563–64. Specifically, she argued that the officers failed to search the two men's cell in a manner that would have enabled them to find the murder weapon and failed to run an investigatory search on the cellmate using the prison's computer database. *Id.* We concluded that both omissions implicated social and public policy considerations. *Id.* at 565. "A prison official's judgment about how extensively to search a cell," we explained, "involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other." *Id.* Moreover, "to decide what steps to take in response to a reported threat, an officer must set priorities among all extant risks: the risk presented by the reported threat, along with the other risks that inevitably arise in a prison." *Id.* Our reasoning in *Alfrey* applies equally to the FBI's nondisclosure of information. The FBI's judgment about how to respond to a reported threat and how extensively to disclose information to other law enforcement organizations implicates many risks, all of which must be weighed in accordance with the FBI's social and public policy judgments.

We note that our decision remains the same whether or not Agent Andersen's decision in fact involved the subjective weighing of policy considerations. Gonzalez contends that the government may be liable for Agent Andersen's actions if his failure to disclose the information in his possession was not actually the result of an exercise of policy-based

discretion. A lazy or careless failure to disclose, Gonzalez posits, would not be shielded under the discretionary function exception. We disagree. To the contrary, the government is not required to prove either that an affirmative decision was made, or that any decision actually involved the weighing of policy considerations, in order to claim immunity. *Terbush v. United States*, 516 F.3d 1125, 1136 n.5 (9th Cir. 2008) ("Of course, after *Gaubert* we do not need actual evidence that policy-weighing was undertaken."); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1028 (9th Cir. 1989) ("[W]e [have] expressly rejected [the] argument that the discretionary function exception cannot apply in the absence of a conscious decision." (internal quotation marks omitted)). In *Alfrey*, we concluded that the prison officials' failure to run a computer database search required weighing policy considerations—including balancing "the risk presented by the reported threat, along with the other risks that inevitably arise in a prison"—without inquiring into whether any prison official was in fact guided by those considerations. 276 F.3d at 565.

Here, too, we need not examine whether Andersen did or did not weigh the Guidelines' policy considerations. The discretionary function exception applies so long as the challenged decision is one to which a policy analysis could apply.[4] *Weissich*, 4 F.3d at 813. We made clear the

---

[4] Even if the FBI negligently conducted an investigation, that does not detract from the fact that the manner of conducting an investigation, including decisions to share or not to share information with other agencies, is rife with discretion and policy judgment and not appropriate for judicial review in a tort action. *See Gaubert*, 499 U.S. at 334; *Kennewick*, 880 F.2d at 1029 ("[I]f the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability."). The statute

fundamental problem with adopting Gonzalez's proposed approach in *In re Consolidated U.S. Atmospheric Testing Litigation*, where we considered whether the discretionary function exception shielded the government's alleged failure to warn nearby military and civilian persons of the health dangers of its nuclear testing activities:

> If the decision to issue or not to issue a "warning" is within the discretionary function exception, then logically the failure to consider whether to issue one necessarily falls within the exception as well. Any other interpretation of the statute would create insurmountable problems in its administration: What would constitute a "decision"? Would a decision to defer decision be a "decision"?

820 F.2d 982, 998–99 (9th Cir. 1987). *Gaubert* and our case law require us to conclude that nondisclosure resulted from a policy judgment, whether or not the judgment was negligently made or not made at all.[5]

---

makes clear that where there is discretion, the government has not waived its sovereign immunity "whether or not the discretion involved [is] abused." 28 U.S.C. § 2680(a).

[5] The dissent cites *Miller v. United States*, 163 F.3d 591 (9th Cir. 1998), for the proposition that the government must show that one of the five "exceptions" to disclosure actually applied here. Dissenting Op. at 38–40. In *Miller*, we determined that Forest Service guidelines about how to fight fires gave the Forest Service discretion to depart from the guidelines in a "multiple fire situation," a situation that was clearly present during the events giving rise to the suit. *Id.* at 594–95. Accordingly, the dissent reasons that the government must demonstrate here that a situation requiring non-disclosure was present. But *Miller* does not require this—in

2.  The design-implementation distinction does not apply
    to permit suit against the government in this case

Gonzalez argues that the FBI's failure to disclose information did not implicate policy concerns under a doctrine that we have termed the "design-implementation distinction." *See Whisnant v. United States*, 400 F.3d 1177, 1181 n.1 (9th Cir. 2005). We have held that, in some cases, "the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." *Id*. at 1181. So, for example, the government exercises policy judgment when determining whether and when to construct a lighthouse, but once it has constructed that lighthouse, it must "use due care to make certain that the light was kept in good working order." *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955). Thus, on occasion, we have required the government to face liability for "a failure to effectuate policy choices already made." *Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989). However, as we discuss in greater detail below, we have cautiously applied this doctrine and we have applied it largely in cases involving public health and safety, and in circumstances where a private party would likely be held

---

fact, *Miller* agrees that a decision "need not be actually grounded in policy considerations" for the discretionary function exception to apply. *Miller*, 163 F.3d at 593. Furthermore, determining whether the "multiple fire situation" trigger was present did not *itself* require a policy judgment (i.e., there either is more than one fire, or there is not). Here, by contrast, determining whether the conditions permitting non-disclosure are even present requires the FBI to make the kinds of policy judgments protected by the discretionary function exception. The government need not demonstrate that its decision not to disclose was actually based on a policy analysis.

liable for the same conduct or omission. *See, e.g.*, *Terbush*, 516 F.3d at 1132–33 (maintaining wastewater management system); *Bolt v. United States*, 509 F.3d 1028, 1033–34 (9th Cir. 2007) (removing snow from parking lot); *Soldano v. United States*, 453 F.3d 1140, 1148–49 (9th Cir. 2006) (setting safe speed limit on road); *Whisnant*, 400 F.3d at 1182–83 (removing mold from meat commissary); *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1215 (9th Cir. 2001) (monitoring safety at logging operation); *Camozzi*, 866 F.2d at 290 (inspecting floors for unguarded openings).

Gonzalez offers two theories for why we should employ this doctrine here. First, she argues that while the Attorney General's original design and promulgation of the Guidelines are protected policy judgments, decisions implementing the Guidelines are mere unprotected "professional judgments." Second, she suggests that the government may also be liable under the design-implementation theory if Agent Andersen had, in fact, decided to disclose the information he had to local law enforcement, but the FBI negligently failed to implement that decision.[6]

---

[6] Gonzalez never alleged that Agent Andersen actually made a decision to alert local law enforcement. At most, the complaint alleged that Agent Andersen provided the map to the Phoenix branch of the FBI. Transmitting the map from one FBI office to another does not indicate that Andersen intended to alert local law enforcement of the threat.

Gonzalez contends that she should have been permitted discovery to obtain "those FBI documents that describe what actions were taken by FBI personnel after learning of the home invasion plans discussed at the recruiting meeting arranged by FBI informant Robert Copley." As we discuss below, however, this was not an abuse of discretion because any negligence that occurred as a result of Agent Andersen's actions is not sufficient to bring this case within the discretionary function exception. *See also supra* note 3.

Neither theory is sustainable. For the reasons we have discussed, FBI agents responsible for following the Attorney General's Guidelines are still imbued with an enormous amount of discretion and judgment in the course of their investigations. We have made clear that the doctrine does not permit liability where, as here, "the implementation itself implicates policy concerns." *Whisnant*, 400 F.3d at 1182 n.3. To conclude otherwise would simply swallow the two-step, discretionary act and policy judgment analysis the Supreme Court set forth in *Berkovitz*. *See* 486 U.S. at 536.

Gonzalez's alternate theory—that Agent Andersen designed a plan that he or others failed to implement properly—fares no better. Whatever Andersen decided to do, and whatever his colleagues in Phoenix did in response, those acts were taken in the course of an exercise in policy judgment. The fact that one or more agents concocted a plan does not make that plan an irreversible agency mandate. Agent Andersen does not bind the United States in tort by deciding to share or not to share information, even if he (or someone else) does not follow up on his plan.

Our decision in *Weissich v. United States* is instructive. There, we considered whether the discretionary function exception immunized the United States Probation Service's ("USPS") failure to supervise adequately a probationer who threatened to kill the district attorney who prosecuted him, and later successfully carried out his threat. 4 F.3d at 812. After concluding that regulations governing probation conditions did not impose a mandatory course of conduct on probation officers, we concluded that supervisory decisions require balancing an officer's "dual obligations to (1) protect the public, and (2) promote the rehabilitation of the probationer." *Id.* at 814. Plaintiffs there made a similar

argument to the one we confront here, contending that USPS "negligently supervised [the probationer] by failing to carry out its own plan of supervision and failing to enforce the terms of [his] probation." *Id.* Significantly, we declined the plaintiff's invitation to sift through the probation officers' actions and identify those indicating USPS's failure to implement their probation plan. Rather, we acknowledged that while "[p]erhaps the officers should have decided to supervise [the probationer] more closely," and "[p]erhaps . . . unannounced home visits might have been more appropriate," these were "judgment calls." *Id.* The United States had no liability "even if it was negligent in supervising" the probationer. *Id.* at 815.

*Weissich* demonstrates that even if the FBI negligently failed to carry out its own plan of disclosing information to local law enforcement, our focus remains on the discretionary and policy-based nature of the Guidelines' disclosure determination. Because the Guidelines are discretionary and involve policy considerations, we cannot parse out the FBI's nondisclosure into "decision" and "implementation" phases. Nor may we conclude that simply because the Attorney General employed policy-based considerations in promulgating the Guidelines, any subsequent decision taken pursuant to those Guidelines is devoid of policy-based considerations. Such conclusions would permit the design-implementation distinction to override the discretionary function exception analysis in contravention of the Court's clear command: we look first to whether a policy permits an agent discretion, and if it does, then we must presume that an agent's act or omissions are grounded in policy, whether or not we suspect that the discretion involved has been abused. *Gaubert*, 499 U.S. at 324; 28 U.S.C. § 2680(a).

Fundamentally, the decision whether or not to disclose information under the Guidelines, like the day-to-day decisions involved in rehabilitating a probationer, requires considerations of public safety, allocation of scarce resources, and the likelihood of success. *See Weissich*, 4 F.3d at 814; *see also Sabow*, 93 F.3d at 1453. Because such interests will often conflict or will not be apparent, balancing the various political, social, and economic considerations is inherent in the officer's judgment. *See Weissich*, 4 F.3d at 814. Far from "ordinary occupational or professional judgments," the FBI's decision whether to disclose information "clearly involve[s] the type of policy judgment protected by the discretionary-function exception." *Alfrey*, 276 F.3d at 566 ("[I]nvestigations by federal officers clearly involve the type of policy judgment protected by the discretionary-function exception."); *cf. Soldano*, 453 F.3d at 1148 ("Setting a safe speed limit for the Road as designed . . . is essentially a matter of scientific and professional judgment."); *Sigman v. United States*, 217 F.3d 785, 795–96 (9th Cir. 2000) (concluding that the discretionary function exception does not apply to a "garden-variety medical malpractice" claim against a military physician, because it involves "a function that is analogous to functions performed by professionals in the private sphere every day"). The FBI's judgment whether to disclose information under the Guidelines implicates policy considerations for the reasons described above, and therefore, the design-implementation distinction does not apply on these facts.

\*\*\*

The Guidelines vest discretion and policy judgment in the FBI. Thus, the district court properly concluded that the government satisfied both prongs of the discretionary

function exception. Moreover, the district judge did not abuse her discretion in denying Gonzalez's request for jurisdictional discovery.

IV

It is tempting to wonder whether a simple warning to local law enforcement could have prevented the tragic deaths of Gonzalez's husband and daughter. But we are not charged with passing upon the wisdom of the government's exercise of discretion, and the law does not permit us to do so, "whether or not the discretion involved [is] abused." 28 U.S.C. § 2680(a). Choices such as these—to disclose or not to disclose—are among the judgment-laden decisions the discretionary function exception was enacted to shield. We decline to use the tort laws to monitor the executive's exercise of its judgment. The judgment of the district court is

**AFFIRMED.**

BERZON, Circuit Judge, dissenting:

Gina Gonzalez, the plaintiff in this action, alleges that a Federal Bureau of Investigation (FBI) agent knew of serious threats to her family.[1]  The information about the threats was lost within the agency and so was not disclosed to local law enforcement, as the FBI's policy requires.  Because no action was taken to follow up on the threat, Gonzalez's husband and nine-year-old daughter were killed and she was injured.

The majority holds that, under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq*., the federal government cannot be held to answer in tort for this entirely avoidable tragedy  That cannot be.

I

Gonzalez's central allegation is that despite a mandatory FBI policy so requiring — "[w]hen credible information is received by an FBI field office concerning serious criminal activity not within the FBI's investigative jurisdiction, the field office shall promptly transmit the information or refer the complainant to a law enforcement agency having jurisdiction," Attorney General's Guidelines for Domestic FBI Operations § VI(C)(2) ("Guidelines") — there was no disclosure to local authorities.   The information was

---

[1] This case was decided below on a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). The district court did not grant jurisdictional discovery, so we take Gonzalez's allegations as true.  *See Sabow v. United States*, 93 F.3d 1445, 1449 (9th Cir. 1996); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

forwarded within the FBI but then, according to Gonzalez, simply lost.

There are exceptions to the FBI's disclosure or referral requirement — "where disclosure would jeopardize an ongoing investigation, endanger the safety of an individual, disclose the identity of a human source, interfere with a human source's cooperation, or reveal legally privileged information." *Id.* But the complaint does not indicate that any FBI investigation was implicated by the non-disclosed information or that any other exception to the mandatory disclosure policy applied.

The Government has not asserted otherwise. Instead, the Government's position is essentially hypothetical — *if* one of the exceptions were applicable, then the nondisclosure decision would be discretionary, and there is no FTCA jurisdiction over discretionary acts. 28 U.S.C. § 2680(a).

But the loss of information subject to a mandatory disclosure policy is not an "exercise of policy judgment," *United States v. Gaubert*, 499 U.S. 315, 326 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 538 n.3 (1988)). Nor does the existence of hypothetically applicable exceptions to a mandatory requirement convert an otherwise mandatory policy into a discretionary one. I respectfully — but emphatically — dissent.

II

Gonzalez's story, recounted in detail in the majority opinion, is a distressing one by any standard. In summary: One early morning in 2009, three members of an extremist "Minutemen" group entered Gonzalez's house wearing masks

and carrying guns. They murdered her husband in front of her. After one of the invaders asked Gonzalez's nine-year-old daughter, B.F., whether her sister was home, he shot B.F. in the face and killed her. The intruders shot Gonzalez as well, several times, and likely would have killed her had she not defended herself with her husband's handgun while calling for help.

Tragically, these events were preventable. An FBI informer was involved in planning the attack. He provided an FBI agent, Chris Andersen, with information about the plan to "hit[] the house like a SWAT team." The informant gave Andersen a map, drawn by the leader of the planned attack, showing the approximate location of the house, and reported that he believed the plotters posed a real and imminent threat.

So what happened? Andersen provided the map to the FBI's Phoenix office, but the office misplaced the map. Neither Andersen nor anyone else notified the Pima County Sheriff's Department, the local law enforcement agency in charge of the town in which Gonzalez's home was located. Had the Sheriff's department been notified, it could have arrested the organizer of the attack, as she was known to the Sheriff's Department and could have been charged with conspiring to carry out the attack before it occurred.

In short, Andersen's well-substantiated information of an impending attack never made it to Pima County officials. Gonzalez's husband and daughter died preventable deaths. The majority holds that the United States cannot be held liable for those deaths, because the FBI had the discretion to withhold information from local law enforcement that could have saved two lives.

## III

"The applicability of the discretionary function exception is determined by a two-part test." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). First, we must determine whether the "challenged conduct . . . is a matter of choice for the acting employee," as "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536. If that test is satisfied, we must also determine whether "the discretion involves the type of judgment that the exception is designed to shield," *Miller*, 163 F.3d at 593, namely "legislative and administrative decisions grounded in social, economic, and political policy," *Gaubert*, 499 U.S. 315, 323 (1991) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). The conduct challenged here — the FBI's failure to disclose information to local law enforcement agencies — does not meet either prong of the test and is therefore not shielded by the discretionary function exception.

## A

In the first place, and most important, the FBI does have a mandatory disclosure policy, and it was applicable to the information agent Andersen acquired. That policy commands FBI personnel in no uncertain terms as to what to do with "credible information . . . concerning serious criminal activity," using mandatory language: "[T]he field office *shall* promptly transmit the information or refer the complainant to a law enforcement agency having jurisdiction." Guidelines § VI(C)(2) (emphasis added).

There are five specific exceptions to this mandatory directive — where disclosure would "jeopardize an ongoing investigation, endanger the safety of an individual, disclose the identity of a human source, interfere with a human source's cooperation, or reveal legally privileged information." *Id.* If one of these exceptions applies, the Guidelines, again using *mandatory* language, *require* that "whenever feasible, the FBI office *shall* make at least limited disclosure to a law enforcement agency or agencies having jurisdiction, and full disclosure shall be made as soon as the need for restricting disclosure is no longer present." *Id.* (emphasis added). The Guidelines therefore "specifically prescribe[] a course of action for an employee to follow," and "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. Because that is so, failing to inform local law enforcement of the kind of serious, specific threat made here was in no way a discretionary act.

The Guidelines do require that FBI field officers make certain evaluations— whether information is "credible," whether it relates to "serious criminal activity," and whether the exceptions do or do not apply. But *any* regulation that sets out criteria for action requires that the responsible government officials determine whether those criteria are or are not satisfied. An otherwise mandatory policy does not become discretionary because it applies only in certain specified circumstances or because it has clearly laid out exceptions. If it did, then *no* "federal statute, regulation, or policy" *Berkovitz*, 486 U.S. at 536, would survive the discretionary function exception; every such proscription is limited to described circumstances, and the responsible employees have to decide whether those circumstances obtain.

In *Tobar v. United States*, for instance, we held that a Coast Guard enforcement manual was mandatory under the first *Berkovitz* prong. 731 F.3d 938, 945–47 (9th Cir. 2013). The enforcement manual stated that "[i]f there are no drugs on board, and there are damages or losses sustained by the vessel, in accordance to the U.S. laws and in a manner complying with international laws, the owner of the vessel will be compensated, as long as neither the vessel nor the crew have been involved in illicit actions." *Id.* at 946. That directive is essentially identical in structure to the Guidelines at issue in this case. It provides that when certain conditions exist — damages or losses sustained by the vessel — federal employees "will" — using mandatory language — take a specific action (compensating the owner) *unless* (exceptions) particular circumstances exist (involvement by the vessel or the crew in illicit actions). A Coast Guard employee would have to make several evaluations to follow this policy — (1) whether the compensation requested is "in accordance to the U.S. laws"; (2) how to provide compensation "in a manner complying with international laws"; (3) what it means to be "involved" in illicit actions in the past, and (4) whether a particular action was "illicit." The need for such evaluations, which could be fairly complex, did not convert the mandatory compensation requirement in the Coast Guard manual into a discretionary policy. *Id.* The holding of *Tobar*, in other words, is that a policy is not discretionary simply because it directs an employee "do *x*, unless *y*." Yet, that is what the majority holds here.

In contrast, the cases in which we have found that policy manuals do set out discretionary criteria, not mandatory directives, have pointed to specific indices that the established policy at issue "d[id] not prescribe courses of action that must be followed." *Sabow v. United States*,

93 F.3d 1445, 1452 (9th Cir. 1996); *see also Weissich v. United States*, 4 F.3d 810, 813–14 (9th Cir. 1993). In *Sabow*, for instance, the manual stated that "the circumstances of a particular case will naturally govern the actions taken to protect and preserve the physical evidence," and noted that its provisions were simply "considered generally valid guides." *Sabow*, 93 F.3d at 1452. In *Weissich*, the policy specified that "[a] warning is not required in every case," and that whether to issue a warning "depends upon a selective case-by-case evaluation," based on a non-exhaustive list of factors. *Weissich*, 4 F.3d at 813.

Most recently, in *Chadd v. United States*, 794 F.3d 1104 (9th Cir. 2015), we found a National Park policy discretionary in the public safety context where the relevant manual specified that "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level," and that where a certain animal species creates a safety hazard, it "will be managed — up to and including eradication — if . . . control is prudent and feasible." *Id.* at 1110. These policies, we concluded, "impose[] no particular, mandatory course of action." *Id.*

The majority ignores the determinative distinction in our case law between policies that direct mandatory actions absent an applicable exception and those that lay out general criteria for discretionary actions. It then goes on to cite *Sabow* for the proposition that "the presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations." *Sabow*, 93 F.3d at 1453. But here, the relevant, mandatory language in the FBI disclosure provision is central to the directive, not "isolated." And the

majority points to no language at all indicating that these Guidelines should be considered "suggestive." Without anything like the explicit invocation of "discretion" in *Chadd* or the "case-by-case evaluation" language in *Weissich*, the FBI's prescribed policy is that serious, substantiated threats — which these clearly were — are required to be communicated to local law enforcement absent an applicable exception. *See Chadd*, 794 F.3d at 1110; *Weissich*, 4 F.3d at 813; *see also In re Glacier Bay*, 71 F.3d 1447, 1452–53 (9th Cir. 1995).

Moreover, and critically, *Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000), also cited by the majority, adds an important consideration applicable here: *Reporting* requirements can be mandatory even if they coexist in policy guidelines alongside discretionary functions, like investigation. *Id.* at 953; *see also Navarette v. United States*, 500 F.3d 914, 917 (9th Cir. 2007). Responding to a similar claim of discretionary function to the one made here, *Vickers* held that "although INS investigators undoubtedly enjoy discretion in the conduct of an investigation, this discretion does not extend to the question of whether to report to superiors or to investigate *at all* an allegation of misuse of Service-issued firearms," where policy guidelines made such reporting, and *some* investigation, mandatory. *Vickers*, 228 F.3d at 953 (emphasis in original).

Here, it is the failure to disclose — that is, report — the threat that is at issue, not the failure to conduct an adequate investigation into those threats, that is the crux of Gonzalez's suit. Gonzalez's complaint is only that the FBI did not report to local law enforcement information already in its possession, as its mandatory Guidelines required. The majority's mantra that this case concerns "investigation and

prosecution of crime" is thus simply wrong, and its voluminous citations to the discretionary nature of criminal investigations and prosecution are similarly beside the point.

In sum: *Any* mandatory policy will require some degree of interpretation by those who must apply it.  If the government were deemed to exercise the kind of "discretion" contemplated by the discretionary function exemption every time an employee is required to read and apply stipulated considerations that, if they exist, *require* that certain steps be taken, all, or nearly all, otherwise mandatory government policies would become discretionary.

I would hold that the FBI's Guidelines here at issue are mandatory.  The FTCA's discretionary function exception is therefore not applicable at all to Gonzalez's claim that the FBI negligently failed to disclose to local law enforcement threats that, under the agency's policies, should have been conveyed.

B

Even if the exceptions to the FBI's mandatory disclosure policy *did* make decisions under those exceptions discretionary with respect to the FTCA, the Government still must prove that those exceptions in some sense were implicated here.  The Government bears the burden of proving the discretionary function exception applies, *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).  It cannot meet that burden by simply saying — without any evidence — that the Guidelines' exceptions *might* have applied.  Although this Court has held that a decision "need not be actually grounded in policy considerations" for the discretionary function exception to apply, *Miller*, 163 F.3d at

593,[2] we have never held that the Government need not affirmatively invoke the discretionary aspects of a hybrid policy — that is, one that is generally mandatory, but has limited exceptions.

*Miller* itself well illustrates that the Government must at least invoke the discretion-granting exceptions to an otherwise mandatory policy apply.  In *Miller*, property owners sued the Forest Service for damages to their property caused by a forest fire escaping from a National Forest. 163 F.3d at 592.  The court noted mandatory language in the Forest Service's guidelines about how Forest Service employees should fight fires, *id.* at 594, but held that the discretionary function applied nonetheless.  *Miller* so concluded in part because the guidelines *also* noted that in "multiple fire situation[s]," limited resources meant that employees should only "*attempt*" to follow their preplanned response, which conferred discretion on the Forest Service as to how best to allocate resources.  *Id.* at 594–95 (emphasis in original).  *Miller* thus contains a hybrid policy similar to the Guidelines, as construed by the majority: Mandatory language required government officials to do *x*, with an

---

[2] I have previously criticized this statement in *Miller* as contradicting the Supreme Court's holding in *Gaubert* — *viz.*, that the discretionary function exception "protects only governmental actions and decisions *based on* considerations of public policy."  *Chadd v. United States*, 794 F.3d 1104, 1114 (9th Cir. 2015) (Berzon, J., concurring) (emphasis added in *Chadd*) (quoting *Gaubert*, 499 U.S. at 323).  I continue to believe that the holding of *Miller* should be reconsidered en banc, for the reasons stated in my *Chadd* concurrence.  Because *Miller* does not, in my view, apply to a hybrid policy such as the one here, this case does not require us to consider whether *Miller* should be revisited, as I suggested in *Chadd*.  That *Miller* is of questionable validity does, however, reinforce my conclusion that it should not be expanded to cover hybrid mandatory/discretionary policies such as the Guidelines here.

exception for specified situations, as to which the policy granted discretion and so triggered the discretionary function exception.

But in *Miller* it was clear that the exception was the applicable provision — there had been multiple forest fires going on in the same region on the same day. *Id.* at 592. The majority's logic here would amount to a stance that in *Miller*, because there *might have been* another fire on the same day, in which case the exception would apply, the Government could invoke the discretionary function exception even if there was no second fire, and no one thought there was. That is, the Government could prevail because *if* it had taken action based on the belief there were two fires, it would have had discretion as to what to do.

Such a fantasy-grounded approach would severely undermine a central purpose of the FTCA, namely, the compensation of individuals who might otherwise be left "destitute or grievously harmed" by the improper implementation of government policy. *Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957). There are a great many policies that, like the one in *Miller*, contain exceptions that, during emergencies or other special circumstances, grant more discretion to the government employees than they otherwise enjoy. The Army's Snow Removal Policy held mandatory in *Bolt v. United States*, 509 F.3d 1028 (9th Cir. 2007), contained a provision that it was "subject to change during emergency situations." *Id.* at 1033. The Department of Health and Human Services' regulations for laboratories that handle toxins and dangerous biological agents allow waivers during "domestic or foreign public health emergenc[ies]." 42 C.F.R. § 73.5(e). The discretionary function exception would swallow the FTCA if these

provisions — in the absence even of an asserted emergency — were held to mean that the government is not liable for negligence in its day-to-day clearing of snow, as in *Bolt*, or in the licensing of laboratories, as in *Berkovitz*.

Here, unlike in *Miller*, the Government has not made any showing that the exceptions apply; that any government employee thought they did; or even that any FBI employee considered whether they did. Gonzalez maintains that the information was just lost — an action that does not suggest that any FBI employee believed the Guidelines applied. The majority is therefore wrong to apply *Miller*'s principle to this case.

Citing *Gaubert*, the majority argues that because the Guidelines' exceptions *permit* discretion (which, as I have explained, I am assuming in this section is true, although I do not think it is), we must presume that the FBI's actions "were grounded in policy considerations." But applying that presumption here jumps the gun, as it assumes, with no proof at all, that the Government was acting pursuant to one of the exceptions, and not pursuant to the generally applicable mandatory reporting requirement.

Moreover, even if the majority is correct that the FBI is entitled to a presumption in its favor that it was acting pursuant to discretion-granting exceptions to a mandatory rule, that would not end the case. Instead, Gonzalez should have an opportunity to rebut this presumption, which would require discovery. Her complaint asserts that the Government was *not* acting to such an exception, but instead simply lost the information. We have previously held that, in a ruling challenging subject matter jurisdiction under the FTCA, "the moving party should prevail only if the material jurisdictional

facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Augustine*, 704 F.2d at 1077; *see also Young v. United States*, 769 F.3d 1047, 1052–53 (9th Cir. 2014). As a result, "the jurisdictional determination should await a determination of the relevant facts." *Young*, 769 F.3d at 1053 (quoting *Augustine*, 704 F.2d at 1077). The relevant facts include, at a minimum, whether the FBI actually invoked the exceptions to the Guidelines in some way, or whether it just lost the information, as Gonzalez alleges. Because the FBI is, most likely, the only entity with this information, the district court should have granted Gonzalez at least minimal jurisdictional discovery with regard to these facts.

## C

Finally, even if the majority is otherwise correct, I would still reverse, as the FBI's decisions under the relevant section of the Guidelines do not qualify as discretionary acts "grounded in social, economic, and political policy." *Young*, 769 F.3d at 1053 (quoting *Berkovitz*, 486 U.S. at 537).

Our precedent has long recognized that "matters of scientific and professional judgment — particularly judgments concerning safety — are rarely considered to be susceptible to social, economic, or political policy." *Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005). The majority states that the Guidelines' considerations governing reporting serious, credible threats to local law enforcement "implicate social, economic, and political judgments," but does not support this conclusion. Instead, the majority repeatedly treats this case as if it asks us to review an FBI *investigation*, concluding that Agent Andersen's actions entailed "social, economic, and political"

policy judgments, rather than professional ones, because "[t]he investigation and prosecution of crime involves policy judgments at the core of the executive branch."

But, once again, the FBI's investigation and prosecution responsibilities have nothing to do with this case. We have not been asked to determine whether Agent Andersen, or any other FBI employee, was negligent in the investigation or prosecution of a crime. The issue before us is whether an FBI employee negligently failed *to disclose* information already in its hands to local law enforcement. The majority's concerns regarding deference to FBI *enforcement* priorities are just not relevant.

\* \* \*

The FTCA protects the public by helping to ensure the Government is attentive to its own policies, and by allowing compensation for those injured by the Government's negligence, where enunciated policies are not followed. In one sense, it is too late for Gina Gonzalez to benefit from the attentiveness the Government should have paid to threats affecting her and her family, as her husband and child are lost to her. But her claim for compensation should go forward. I respectfully dissent.